IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 09-CV-02418-PAB-MJW

MELISSA MELLOTT,

Plaintiff,

v.

MSN COMMUNICATIONS, INC.,

Defendant.

---

**DEFENDANT'S MOTION FOR ATTORNEYS' FEES AND COSTS**

---

**CERTIFICATE OF COMPLIANCE**

Defendant MSN Communications, Inc. ("MSN") submits this motion pursuant to this Court's October 29, 2010 order (Dkt. 130).

**INTRODUCTION**

Pursuant to this Court's inherent power to deter and sanction abuse of the judicial process, in addition to 28 U.S.C. § 1927, Title VII of the Civil Rights Act of 1964, and Federal Rules of Civil Procedure 11, 26 and 37, MSN requests that the Court award its attorneys' fees and costs against Plaintiff and her counsel jointly and severally.

Plaintiff initiated and maintained her fraudulent claims in this case through fabricated evidence and by alleging that she remained unemployed when in truth she obtained immediate and constant re-employment albeit though theft of another person's social security number. Plaintiff continued the perpetration of her fraud on this Court through additional manufactured evidence, false discovery responses supported by perjurious testimony and most recently, blatant contempt of this Court's orders.

The scope of Plaintiff's fraud is truly astounding. Plaintiff's lies have inculpated the United States Air Force, the Department of Homeland Security, the Social Security Administration, the Internal Revenue Service, the Colorado Department of Labor as well as the British government. MSN has incurred extraordinary attorneys' fees uncovering Plaintiff's lies and proving her explanations false. At each turn, Plaintiff offers a new and different explanation, often supported by more fabricated evidence requiring MSN to incur more fees to prove the latest fabrication untrue.

Judge Watanabe commented at a recent hearing that in his thirty-seven years, he has never seen a case like this one. Defense counsel submits that the explanation for why the Court has not seen such fraud perpetrated before it is because Plaintiff's counsel failed to put a stop to it. Plaintiff's counsel did more than turn a blind eye in this case. In the face of direct evidence of his client's social security fraud (and other lies), he made no effort to independently investigate the evidence provided by MSN to him, he ignored other non-party witness testimony contradicting his client's statements, and he continued to sign and support discovery responses, pleadings, motions and oral arguments to the Court maintaining his client's unbelievable tales.[1] The attorney's obligations under Rule 11, section 1927, and as an officer of this Court demand that under the circumstances of this case, the attorney either counsel his client to come clean and tell the truth, or the attorney must withdraw. Mr. Olsen did neither in this case – but instead he continued his client's fraud despite overwhelming evidence of her misconduct, and he repeatedly and vexatiously vilified MSN and its counsel for the steps taken to uncover his client's conduct and present it to this Court. It is for that conduct, and the resulting exponential increase in the attorneys' fees and costs incurred by this defendant that MSN respectfully

---

[1] MSN is attaching as Ex. 1, an Appendix identifying each document that Plaintiff submitted to this Court that contained false, and indeed, fraudulent, representations.

2

requests that the Court award all fees and costs against Plaintiff's attorney in addition to Plaintiff, jointly and severally.

## STATEMENT OF FACTS[2]

### A. Although Plaintiff Repeatedly Testified That She Was Unemployed, She Has In Fact Been Employed And Earning A Six Figure Salary Throughout This Litigation.

Starting with the allegations in her Complaint, Plaintiff and her counsel have repeatedly asserted in this litigation that Plaintiff has been unable to earn compensation since the termination of her employment with MSN. *See, e.g.* Pl.'s Supp. Resp. Rogg. 22, Ex. 2; Mellott Depo. 42:2-6, Ex. 3. After being confronted with evidence to the contrary showing she earned substantial income through employment by Qwest Communications, Inc. ("Qwest") and Blackstone Technology Group ("Blackstone"), Plaintiff modified the testimony just given at her deposition and admitted that she had done some limited work for them but claimed she earned only approximately $12-14,000. *See* Ex. 3 at 281:17-284:12. The truth is that by the time Plaintiff initiated this lawsuit on October 13, 2009, she had been employed by Blackstone and Qwest for over nine months, and she had earned over $85,000. S*ee* Blackstone & Qwest employment records, Exs. 4, 5. By the date of her deposition, Plaintiff had earned $153,665.27.[3]

Beginning in January 2010, MSN repeatedly provided conclusive evidence to Plaintiff's counsel that disproved his client's testimony that she remained unemployed. *See, e.g.*,

---

[2] Because of the page limitation, it is not possible for MSN to document in this brief all of Plaintiff's misconduct, or all of the conduct on the part of her attorney demonstrating his culpability in her misconduct. *See also* MSN's Motion to Compel Disclosure of Attorney Client Communication Pursuant to the Crime Fraud Exception (Dkt. 140) and Defendant's Motion to Dismiss (Dkt. 51). The more egregious misconduct is summarized here.

[3] MSN intends to subpoena the testimony of Qwest and Blackstone representatives to authenticate these payroll records at the December 21 hearing.

correspondence to J. Olsen, Ex. 6; MSN's First Supp. Rule 26(a)(1) Disc., ¶¶ 3, 4, Ex. 7; MSN's Fifth Supp. Rule 26(a)(1) Disc., Ex. 8; MSN's Mot. for Leave to Take Two Day Depo. (Dkt. 32, p. 3, ¶ 8). *See also* March 11, 2010 Depo of T. Mellott at 115:23-117:23, Ex. 9 (Plaintiff's mother-in-law testified Plaintiff employed by Qwest since "last summer"); March 5, 2010 Depo of W. Farnsworth at 118:8-122:15, Ex. 10 (Plaintiff forwarded to him Qwest employment offer dated May 2009 and he later confirmed she worked for Qwest). Yet, Plaintiff's counsel ignored all of this evidence and continued to maintain that Plaintiff remained unemployed.

**B.      Plaintiff Engaged in Identity Theft to Conceal The Fact That She Was Employed**

Plaintiff's concealment of her post-termination employment involved her theft of another individual's social security number that Plaintiff used as her own. When confronted with the evidence of this fraud, Plaintiff crafted lie after lie, supported by more manufactured evidence, and her counsel did nothing.

Plaintiff certified to MSN at the time of her employment that her social security number was 419-XX-XXXX. *See* I-9 Form, Ex. 11. After her termination from MSN, when Plaintiff filed her claim for unemployment benefits with the State of Colorado, she again identified her social security number as 419-XXXXXX. *See* Mellott Administrative Application, Ex. 12.[4]

On January 27, 2009, twelve days after her termination by MSN, Plaintiff signed a full-time employment contract with Blackstone earning $75 per hour. In the document, she stated that her social security number was 262-XX-XXXX. *See* Ex. 4. Plaintiff affirmed that her social security number was 262-XX-XXXX in her I-9 form, and provided a social security card to

---

[4] The Colorado Department of Labor has since concluded that Plaintiff was in fact employed and receiving income under someone else's social security number while fraudulently collecting unemployment under her own. *See* CO DOL credit to MSN, Ex. 13.

4

Blackstone using the same number. *See* Ex. 14.[5]  Plaintiff subsequently provided Qwest with records that appear to use the same fraudulent social security number as the one provided to Blackstone, but the social security number has been redacted on the records produced by Qwest. *See* Ex. 15.[6]

262-XX-XXXX is in fact the social security number of Ms. Prince. S. Prince Aff., Ex. 16.[7] When confronted at her deposition with the evidence that she had been using two different social security numbers, Plaintiff provided a preposterous explanation. MSN has proven that this explanation is also a complete fabrication.

Plaintiff's husband, Jason Mellott, is employed by the Air Force in Colorado Springs. Plaintiff testified in her deposition that, for national security reasons, the social security card showing the 262 number was given to her by her husband's then-commander, in a confidential package, along with instructions that she was to use the 262 "federal locator number" with any potential employers and physicians. S*ee* Mellott Depo., Ex. 3 at 123:9-127:22; 270:10-272:17; 274:8-11*.*  Counsel for MSN then contacted representatives of the military to check the veracity of Plaintiff's testimony, and was informed that the testimony was a complete fabrication. *See*

---

[5] Blackstone's records show that between January 2009 and June 2009, Plaintiff received a total of $51,825, reported to Ms. Prince's social security number 262-XX-XXXX. *See* Ex. 4.

[6] Qwest's records show that between May 18, 2009 and December 31, 2009, another period Plaintiff has claimed in this litigation that she was unemployed, Plaintiff received a total of $68,844.59 in compensation from Qwest. Between January 1, 2010 and May 1, 2010, Plaintiff received an additional $48,154.36 in compensation from Qwest. *See* Ex. 5.

[7] Mrs. Prince has offered to testify before the Court on December 21. A Google search for Sandra Prince in Florida identifies a collection of articles regarding a different Sandra Prince who is believed murdered in 2005. Ex. 17. Identity thieves often look to use the social security numbers of deceased individuals believing it unlikely to detect. Here, it seems Plaintiff may have intended to hide her income by using the deceased Sandra Prince's social security number – but she got the wrong Sandra Prince.

Affidavit of Major Richard Williams, Ex. 18.

In response to Major Williams' unequivocal affidavit, Plaintiff provided an entirely new explanation for why she was using Ms. Prince's social security number, (with no explanation for why she abandoned her "federal locator" story) and, in support of this new story, Plaintiff produced new documents.[8]  See Plaintiff's Response in Opposition to Defendant's Motion to Dismiss ("Response", Dkt. 82).

MSN provided a detailed analysis of Plaintiff's new explanation for her use of Ms. Prince's social security number and how that explanation is, once again, a complete fabrication, at page 5-8 of its Reply in Support of Motion to Dismiss ("MTD Reply" Dkt. 113).  Due to the constraints on the length of this brief, MSN will not repeat that analysis herein.  In essence, Plaintiff's new claim was that, for some completely unexplained reason, the IRS had directed her to use Ms. Prince's social security number in lieu of her own SSN.  Although MSN has had no opportunity to question Plaintiff concerning this new explanation, as discussed in detail at pages 5-8 of its MTD Reply, Plaintiff's new explanation boarders on the irrational,[9] and even a cursory inspection of the "new" documents strongly suggests that they are simply the latest example of Plaintiff's fabrication of evidence.[10]

---

[8] Plaintiff produced the documents to MSN for the first time two days prior to filing her Response.

[9] During the course of this litigation, Plaintiff has claimed that Qwest has lied about her and submitted fraudulent payroll records to the IRS, that Blackstone has lied about her and submitted a fraudulent W2 to the IRS, that Major Williams lied in his affidavit, and most recently, that her own husband lied in his testimony about her whereabouts.

[10] MSN believes that Exhibits 19 and 20 are screen shots that the SSA would provide to any person who requested verification of their social security number, and that Plaintiff has altered the documents by cutting and pasting Ms. Prince's social security number in for her own.  Similarly, MSN believes that Exhibit 21 is an altered version of a legitimate IRS letter confirming her children's social security numbers after adoption by Jason Mellott, doctored to show Plaintiff's name and Ms. Prince's SSN.

Because discovery has been stayed, MSN has had no ability to confirm these suspicions through the discovery process. However, counsel for MSN has shown Exhibit 22 to an official at the Denver office of the Social Security Administration, who informed counsel that the document is not authentic and that the Social Security Administration does not utilize any document of that nature. MSN has requested the Social Security Administration provide a witness to testify at the December 21 hearing to verify that the screen shots produced by Plaintiff are fraudulent and/or manufactured. Regardless, what is strikingly absent from the record is any attempt by Plaintiff's counsel to offer any evidence – other than his own declaration or his client's – to support her ever changing and fantastical stories.

**C.** **Plaintiff's Claim of Sexual Harassment was also Based on a Fabricated Document.**

To support her claim of discrimination, Plaintiff produced, through counsel, altered emails purportedly from Plaintiff to MSN's HR director complaining of discrimination. *Compare* emails produced by MSN, Ex. 23 (produced by MSN on February 11, 2010) & emails produced by Plaintiff, Ex. 24. *See also* Dec. of A. Litchfield, Ex. 25. MSN's forensic expert demonstrated that emails can be saved by an individual recipient and easily altered, and that Plaintiff clearly did so here. Dkt. 51, Ex. 23 ¶¶ 15-16, 30-31. Although Plaintiff denied altering the document and offered the opinion of a purported "expert" (with no credentials) who asserted that an email could not be altered in this manner (Dkt. 82, Ex. 24), MSN's forensic expert is clearly more credible.

**D.** **Plaintiff has Provided Perjured Testimony in Recent Hearings before Magistrate Judge Watanabe and Flagrantly Ignored Orders of this Court.**

The most recent conduct by Plaintiff and her counsel in presenting false testimony and documents to the Court are truly most remarkable and the catalyst for Magistrate Watanabe's remark. The Court ordered Plaintiff and her counsel to appear on October 27, and to bring Plaintiff's U.S. Passport to confirm previous statements by Plaintiff under oath that she and her

7

husband had been reassigned to Germany by the Air Force – statements directly contradicted by the Air Force. *See* (Dkt. 77, 82, 93, 98, 118, 121); Ex. 18. The bizarre series of events that followed are summarized below:[11]

- Just prior to the October 27 hearing, Plaintiff's counsel sought MSN's consent to postpone the hearing. MSN declined, and suspicious of Plaintiff's activities, peremptorily notified the Court of its objections to Plaintiff's efforts to postpone. (Dkt. 117). Plaintiff then submitted a declaration to the Court that she could not appear at the hearing because she and her children were presently living in London, and she could not afford the plane ticket to return. (Dkt #118). The Court denied her request to postpone the hearing. Plaintiff then filed a motion to dismiss her claims with prejudice, again seeking the Court's permission to postpone the hearing. (Dkt. 121), which request was again denied. The Court did grant Plaintiff's motion to dismiss on Oct. 29, 2010. (Dkt. 130).

- Plaintiff did not appear at the October 27, 2010 hearing. Plaintiff's husband did appear, and testified that his wife and children were not in London, but rather were in fact living in Colorado with him; that he had spoken with her that morning about whether she was coming to the hearing and she told him she was not. Mr. Mellott also confirmed that he had not been reassigned to Germany by the Air Force, and in fact had not traveled outside the country in 2010. MSN also presented testimony of an

---

[11] Transcripts of each of the hearings described below have been prepared. MSN is not attaching the testimony here due to Magistrate Watanabe's ongoing sequestration orders. MSN can provide copies of the transcripts to the Court upon request.

- eye witness who saw Plaintiff in Colorado two days before the hearing, and a photograph of her from the scene.

- As a result of Mr. Mellott's testimony directly contradicting Plaintiff's declarations about his relocation to Germany, Plaintiff's counsel filed a Motion to Withdraw Certain Pleadings and Averments (Dkt. 132), advising the Court that he believed his client had offered false testimony. Plaintiff's counsel also sought MSN's position on his intent to withdraw from representing Ms. Mellott. (He has yet to do so).

- Based on Mr. Mellott's testimony that he and his wife were making plans to relocate to Europe to "protect her" from this litigation, MSN requested the Court order Plaintiff to surrender her passport. The Court set another hearing for November 8, again ordering Plaintiff to bring her passport showing the dates of her alleged travel to Germany with her husband.

- Plaintiff appeared on November 8 with her U.S. Passport which contained no evidence to support the dates of her alleged travel to and from Germany and London. Plaintiff offered a most bizarre explanation for the missing passport evidence, claiming she owned a British Passport that she used for intra-European travel, and that she was forbidden to bring that passport to the U.S. Plaintiff also testified that her husband had lied about her living and working in Colorado. Magistrate Watanabe ordered Plaintiff to appear the following day with the passports of her six children to verify her testimony that they had traveled to and from London with her over the past several months.

9

- The next day, Plaintiff appeared but without the children's passports blaming her husband for withholding them from her.  She produced a one page photocopy purporting to show two pages of two of the kids' passports – highly suspicious in their appearance.  Magistrate Watanabe set another hearing on November 16 ordering Plaintiff, her counsel and her husband to appear with the passports.

- In direct violation of Judge Watanabe's order, Plaintiff again failed to appear.  Mr. Mellott did appear, without the children's passports, indicating his wife had taken them from their safe.

- As a result, the Court has entered 2 Orders to Show Cause for Plaintiff's failures to appear, setting the return dates for those Orders also on December 21.

Looking back, this bizarre chain of events suggests Plaintiff found herself cornered by her own lies, and as she flailed about desperate to conjure some explanation for them, she only made matters worse.  Notably, she failed to appear each time her husband did appear – because their testimony directly contradicts one another, and to appear simultaneously would provide the Court the opportunity to directly confront her with that conflict with her husband present.  Further, the only rational explanation for her failure to bring the passports – twice – is that they do not corroborate her testimony.  Otherwise, without question, both Plaintiff and her attorney would have immediately provided the passports to prove to the Court the veracity of her testimony.  The Court is now left to decide which – husband or wife – is telling the truth and which has committed perjury by testifying falsely to the Court.  MSN argued to the Court at the November 16 hearing all the reasons the Court can only conclude the Plaintiff's testimony is unbelievable.

## **LEGAL ARGUMENT**

**II.     THE COURT HAS THE AUTHORITY TO SANCTION PLAINTIFF AND HER COUNSEL FOR VIOLATIONS OF FED. R. CIV. P. 11.**

Where the court finds Rule 11 has been violated, the imposition of sanctions is mandatory.  *See Chevron, U.S.A., Inc. v. Hand*, 763 F.2d 1184, 1187 (10th Cir. 1985).  Sanctions may be imposed on the person who signs the pleading, motion, or other paper that violates Rule 11, on the represented party, <u>or both</u>.  *Id*.; *see also White v. Gen. Motors Corp.*, 139 F.R.D. 178, 182 (D. Kan. 1991) *aff'd*, 977 F.2d 499 (10th Cir. 1992).  *See also Pope v. Fed. Express Corp.*, 974 F.2d 982 (8th Cir. 1992) (in Title VII action, plaintiff and counsel sanctioned for plaintiff's use of manufactured evidence and counsel's continued reliance upon it).

As explained above, Plaintiff's entire conduct in this case from her Complaint alleging baseless claims, to her continued declarations that she remained unemployed while using Ms. Prince's 262# followed by lie after lie to cover up her groundless claims clearly perpetrated a fraud on this Court.  Her attorney's failure to verify his client's allegations at the outset, followed by his continued failure to do any independent investigation of her statements when provided with direct contradictory evidence constitutes a continuing violation of his obligations under Rule 11.  For their combined conduct, Plaintiff and her counsel should be sanctioned for violation of Rule 11.

Rule 11 requires that counsel make an inquiry "reasonable under the circumstances" to confirm there is evidentiary support for factual contentions made in litigation.  Counsel for Plaintiff has repeatedly violated that requirement.  As early as January 6, February 1 and February 9, 2010, MSN provided Mr. Olsen with evidence that, contrary to her sworn testimony, Plaintiff was employed and earning a substantial salary but reporting the income under a social

11

security number other than her own.  *See* Ex. 6.[12]  In March 2010, counsel was present at the depositions of two nonparty witnesses who testified they knew of Plaintiff's employment at Qwest.  *See* Exs. 9 and 10.  In the face of all of this evidence to the contrary, Plaintiff's counsel signed a supplemental discovery response that continued to assert that Plaintiff was unemployed, (Dkt. 22, at 4); *see also* Ex. 2, p. 3, and submitted yet another pleading a month later again stating that his client remained unemployed.  (Dkt. 33, p. 2, ¶ 6).

Although Mr. Olsen was directly confronted with the incontrovertible evidence of his client's employment and social security fraud, he did not fulfill his ethical obligation to withdraw the claims or even investigate Plaintiff's allegations.  *Pope,* 138 F.R.D. at 681 ("Upon making a finding that the evidence was manufactured, plaintiff's attorney had an ethical responsibility to stop relying on Exhibit 203 as evidence in plaintiff's case."); *White v. Gen. Motors Corp., Inc.*, 908 F.2d 675, 680 (10th Cir. 1990) ("[T]he attorney's belief must also be in accord with what a reasonable, competent attorney would believe under the circumstances.").  Instead, Mr. Olsen accepted his client's explanation – that "both Qwest and Blackstone had issued false payroll information" concerning Plaintiff.  *See* Dkt. 82, Ex. 23 ¶ 79.  This story would be incredulous if it only involved one company, but to suggest that two companies both made this same egregious error is beyond comprehension.  To be believed, not only have Blackstone and Qwest issued misleading W2s, but all of the other documentation produced by the companies would be false as well – time sheets, individual accounting records of payroll disbursements, etc.  While MSN took steps required to verify Blackstone and Qwest's records were accurate, *see* Exs. 4 & 5; *see also* Blackstone Aff., Ex. 26, Plaintiff's counsel utterly failed to take <u>any</u> steps to

---

[12] Plaintiff's counsel's obligation is particularly heightened in a case like this where Plaintiff had previous counsel who withdrew from the representation.  *Duffield v. First Nat'l Bank*, 715 F. Supp 255, 258-59 (W.D. Ark. 1989).  *See* Mot. to Dismiss, p. 25 (Dkt. 51).

independently verify Plaintiff's testimony with the SSA, Qwest or Blackstone.

Counsel also failed to fulfill his responsibilities under Rule 11 by simply accepting Plaintiff's specious argument that she had a "federal locator number" due to her husband's military assignment, and she was required to report her income and file her taxes under another person's social security number, in order to "mask" her husband's whereabouts. In the face of the Air Force Senior Supervising Attorney's Affidavit to the contrary, Plaintiff's counsel did nothing to independently verify his client's explanation. Instead, he prepared further pleadings and declarations in support of his client's **new and different** explanation of her use of Sandra Prince's social security number, with **new and different** documents and the alleged support of a **new and different** federal agency. See MSN's Reply to Motion to Dismiss.

Plaintiff's counsel went so far as to attach his own declaration in an attempt to bolster Plaintiff's theories that the military would provide her with top secret military clearance, suggesting that Plaintiff's story regarding the federal locator number was valid. See Dkt. 82, Ex. 27. In that Declaration, counsel for Plaintiff continued his vilification of MSN and its attorneys for the fact they had attempted to verify Plaintiff's false claims. Id., ¶ 10-14. All of this conduct violated counsel's obligations under Rule 11. White, 139 F.R.D. at 182 (attorney sanctioned per Rule 11 for advancing specious arguments). These ever-evolving fraudulent explanations, perpetrated by Plaintiff with the support of her attorney, caused MSN to incur more and more attorneys' fees to disprove them.

Counsel's misconduct did not end at that point. As discussed above, when confronted with overwhelming evidence that Plaintiff had lied when she claimed she was in Germany on certain dates in July and August, and could not appear at the October 27, 2010 hearing because she was in London, Mr. Olsen not only signed his name to court documents falsely asserting that Plaintiff was in Germany (Dkt. 77, 82, 93, 98, 118, 121), he also again tried to

13

support Plaintiff's lies by providing his own Declaration stating that he had called Plaintiff in Germany, and that notations on her bank records confirmed her false claims about being in Europe. Dkt. 98, Ex. 2, ¶¶ 2-6, Ex. 28. A review of those bank records immediately identifies that they have been redacted in a manner that makes them useless. However, as Plaintiff's counsel, Mr. Olsen clearly could have independently investigated her highly suspect claim by insisting on seeing the unredacted bank records, Plaintiff's passport, her children's passports, travel receipts, documentation concerning her claims of overseas employment, or any number of other records that would have been uncovered the fraud Plaintiff attempted to perpetrate the Court.

Even after Mr. Olsen personally saw at the November 9, 2010 hearing, that Plaintiff's U.S. passport does not contain any stamp indicating that she traveled through Germany or London during the months of July-October of this year, he argued that Plaintiff's passport is "replete with travels to Europe." *See* 11/16/10 Hearing Transcript at 26:1-2. *See* Fed. R. Civ. P. 11 advisory committee's note (oral statements are Rule 11 Violations); *O'Brien v. Alexander*, 898 F.Supp. 162, 175 (S.D.N.Y. 1995) (same). And, even after hearing Plaintiff's preposterous testimony that she, an American citizen, has a British passport that she is only allowed to use in Great Britain, Mr. Olsen continues to sign his name to court filings advancing her lies. (Dkt. 148). Only at the 11th hour, when Plaintiff was caught red handed, did Mr. Olsen finally admit that portions of some of the filings were false. (Dkt. 132). His belated attempt to withdraw those false pleadings does not mitigate in any respect his repeated Rule 11 violations.

**III.   MSN IS ALSO ENTITLED OF AN AWARD OF ITS ATTORNEYS' FEES UNDER TITLE VII AS THE PREVAILING PARTY IN THIS LITIGATION.**

Section 706(k) (42 U.S.C. 2000e-5(k)) authorizes a fee award to a prevailing party under Title VII. A defendant can be a prevailing party and receive fees if it shows that the action was

14

"frivolous, unreasonable or without foundation, even though not brought in subjective bad faith." *See, e.g., Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n*, 434 U.S. 412, 421 (1978). *See also Twilley v. Integris Baptist Medical Ctr.*, 16 Fed. Appx. 923, 926 (10th Cir. 2001) (when Plaintiff's claims were based on mere speculation and conjecture, and where employee continued to litigate after it became clear during discovery that his claims lacked evidentiary support, Defendant was the prevailing party entitled to fees). There is even a stronger basis for awarding fees when there is a finding that Plaintiff has acted in bad faith. *Neidhardt v. D.H. Holmes Co.*, 583 F. Supp. 1271, 1276 (E.D. La. 1984) (awarding fees pursuant to Title VII because Plaintiff's suit was result of collaboration and fabrication or maybe just the result of Plaintiff's fantasies); s*ee also Charves v. Western Union Tel Co.*, 711 F.2d 462 (1st Cir. 1983) (female employee brought discrimination suit and court awarded fees to defendant finding claim was frivolous). Furthermore, when a party's counsel has acted in bad faith, an award of fees against counsel is appropriate. *See Durrett v. Jenkins Brickyard, Inc.*, 678 F.2d 911, 917-18 (11th Cir. 1982) (in Title VII action, court has inherent power to award fees of prevailing defendant against counsel).

A party acts in bad faith when the claim brought "is entirely without color and has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons." *Browning Debenture Holders' Committee v. DASA Corp.*, 560 F.2d 1078, 1088 (2d Cir.1977). Courts have awarded prevailing fees to a defendant where, as here, Plaintiff voluntarily dismissed to avoid an adverse legal judgment. *See, e.g., Interstate Underwriting Agencies, Inc. v. Gunter*, 624 F. Supp. 774, 775 (S.D. Fla. 1985).

There can be no question that the misconduct of Plaintiff in this litigation more than meets this standard. As a result, Title VII provides an independent basis for the Court to award fees to MSN.

## IV. THE COURT CAN AWARD FEES AGAINST MR. OLSEN PURSUANT TO 28 U.S.C. § 1927.

"Any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, an attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927; *Hamilton v. Boise Cascade Exp.*, 519 F.3d 1197 (10th Cir. 2008). "Sanctions under § 1927 are appropriate when an attorney acts recklessly or with indifference to the law. They may also be awarded when an attorney is cavalier or bent on misleading the court; intentionally acts without a plausible basis [or] when the entire course of proceedings was unwarranted." *Dominion Video Satellite Inc. v. Echostar Satellite L.L.C.*, 430 F.3d 1269 (10th Cir. 2005). Where an attorney's conduct "rise[s] to the level of a serious and studied disregard for the orderly processes of justice," sanctions under §1927 are appropriate. *Shackelford v. Courtesy Ford, Inc.*, 96 F.Supp.2d 1140, 1144 (D. Colo. 2000). Pursuant to § 1927, three requirements must be met for liability to be imposed: (1) a multiplication of proceedings by an attorney; (2) by conduct that can be characterized as unreasonable and vexatious; and (3) a resulting increase in the cost of the proceedings. *Hidahl v. Gilpin County Dept. of Social Services*, 699 F.Supp. 846, 850 (D. Colo. 1988).

The *Shackelford* case is instructive. In *Shackelford*, the court sanctioned plaintiff's counsel after determining that the initial claim of wrongful termination was frivolous, and that counsel continued to maintain the claim after that determination.. The court held the continued prosecution of an action after discovery that it is meritless "constitutes disregard for the orderly process of justice" and sanctions under § 1927 were warranted. The conduct of Mr. Olsen, summarized above, clearly satisfies this standard. *See Steinert v. Winn Group, Inc.*, 440 F.3d 1214 (10th Cir. 2006) (Section 1927 requires lawyers to "regularly re-evaluate the merits of their

16

claims and to avoid prolonging meritless claims.").

**V.    THE COURT MAY AWARD FEES FOR PLAINTIFF'S DISCOVERY VIOLATIONS.**

The Court may award attorneys' fees or enter other appropriate sanctions where a party fails to properly supplement discovery responses. Fed. R. Civ. P. 26(g)(3) & 37(c). Both parties and counsel may be held personally liable for expenses, including attorneys' fees, caused by the failure to comply with discovery orders. *Roadway, Exp., Inc. v. Piper*, 447 U.S. 752, 763-764 (1980); *see Stanziale v. First Nat'l City Bank*, 74 F.R.D. 557 (S.D.N.Y. 1977) (attorneys sanctioned); *Chesa Int'l, Ltd. v. Fashion Assoc., Inc.*, 425 F.Supp. 234 (S.D.N.Y.), *aff'd*, 573 F.2d 1288 (2nd Cir. 1977) (joint liability of attorney and party). Here, Plaintiff and her counsel, at a minimum, failed to disclose that Plaintiff had earned income in 2009 and 2010 , and failed to supplement discovery responses showing continued employment in 2009 and 2010.

**VI.   THE COURT HAS THE INHERENT AUTHORITY TO IMPOSE SANCTIONS NECESSARY TO MAINTAIN THE INTEGRITY OF THE JUDICIAL PROCESS.**

This Court has the inherent authority to impose sanctions for bad faith conduct in litigation. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 49 (1991) (holding that even when there are available sanctions under statutes or various rules including 28 U.S.C. § 1927 and F.R.C.P. 11, the inherent authority of the Court is an independent basis for sanctioning bad faith conduct in litigation)*; see also In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995) ("these rules are not substitutes for the inherent power"). "The exercise of inherent authority is particularly appropriate for impermissible conduct that adversely impacts the entire litigation." *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 516 (6th Cir. 2002). The courts' inherent authority includes "the ability to do whatever is reasonably necessary to deter abuse of the judicial process." *Eash v. Riggins Trucking Inc.,* 757 F.2d 557, 567 (3d Cir.1985) (en banc); *Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.*, 771 F.2d 5, 11 (1st Cir. 1985). "The key to

unlocking a court's inherent power is a finding of bad faith." *Barnes v. Dalton,* 158 F.3d 1212, 1214 (11th Cir. 1998).

One aspect of a court's inherent power is the ability to assess attorneys' fees and costs <u>against the client or her attorney, or both</u>, when either has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers*, 501 U.S. at 38, 45-46 (emphasis added); *Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersystems Gmbh*, CIV 98CV-01072-RPM, 2008 WL 410413 (D. Colo. Feb. 12, 2008) (joint and several attorney fees and expenses awarded for trial misconduct); *Campana v. Muir*, 786 F.2d 188, 191 (3d Cir. 1986) (relying upon court's inherent power to hold that client and attorney shared equal responsibility for relying on defense that had no legal justification and thus the fee award was made against them jointly and severally).

The extent of misconduct by Plaintiff and her counsel in this case, documented here and elsewhere in the record, clearly justifies the Court's exercise of its inherent power in this case. As a sanction, both Plaintiff and her attorney should be directed to reimburse MSN for the attorneys' fees and costs it has incurred in this litigation.

## **CONCLUSION**

Based on the foregoing analysis, MSN respectfully requests that this Court award MSN its reasonable attorneys' fees and costs, jointly and severally against Plaintiff and her counsel.

Dated:   November 23, 2010          Respectfully submitted,

<u>*s/ Julie M. Walker*</u>
Julie M. Walker, #24829
Christina J. Valerio, #36754
Wheeler Trigg O'Donnell LLP
1801 California Street, Suite 3600
Denver, Colorado 80202
Telephone:  (303) 244-1800
Fax:  (303) 244-1879
walker@wtotrial.com
valerio@wtotrial.com

*Attorneys for Defendant*
*MSN Communications, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 23, 2010 I filed the foregoing **DEFENDANT MSN COMMUNICATIONS, INC.'S MOTION FOR ATTORNEYS' FEES AND COSTS** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

- **John R. Olsen, Olsen & Brown LLC**

<u>s/ Julie M. Walker by Tanya D. Huffaker</u>

1200064v.10