IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  09-cv-02418-PAB-MJW

MELISSA MELLOTT,

Plaintiff,

v.

MSN COMMUNICATIONS, INC.,

Defendant.

---

## ORDER REGARDING
## DEFENDANT MSN COMMUNICATIONS, INC.'S MOTION FOR COURT ORDER TO PLAINTIFF TO SURRENDER PASSPORT, AND FOR EXPEDITED RULING
## (DOCKET NO. 126)

---

**Entered by Magistrate Judge Michael J. Watanabe**

This matter was before the court on November 9, 10, and 16, 2010, for hearing on Defendant MSN Communications, Inc.'s Motion for Court Order to Plaintiff To Surrender Passport, and for Expedited Ruling  (docket no. 126).

The court has considered the subject motion (docket no. 126), the response (docket no. 135 ), and the reply (docket no. 136).  The court has also considered the testimony and credibility of Melissa Mellott on November 9, 2010, and the statements made by Jason Mellott to the court on November 16, 2010.  Furthermore, this court has taken judicial notice of the hearing held before Magistrate Judge Watanabe on October 27, 2010, concerning Defendant MSN Communications, Inc.'s Motion for Attorney Fees and Costs (docket no. 85), which hearing is continued to December 21, 2010, at 10:30 a.m.  The court has considered the testimony and credibility of Jason Mellott and Clifton

2

Wiser who both testified at the October 27 hearing and has also considered the exhibits received into evidence at this hearing.  In addition, this court has taken judicial notice of the entire court file.  Furthermore, this court has considered applicable Federal Rules of Civil Procedure and case law.  Lastly, the court has considered arguments by the parties through counsel.  The court now being fully informed makes the following findings of fact, conclusions of law, and order.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The court finds:

1.     That I have jurisdiction over the subject matter and over the parties to this lawsuit;

2.     That venue is proper in the state and District of Colorado;

3.     That each party has been given a fair and adequate opportunity to be heard;

4.     That on September 21, 2010, Magistrate Judge Watanabe entered the following minute order (docket no. 106):

> It is hereby ORDERED that Defendant MSN Communications, Inc.'s Motion for Attorneys' Fees and Costs (docket no. 85) is set for hearing before Magistrate Judge Watanabe on October 27, 2010, at 2:30 p.m., in Courtroom A-502, Alfred A. Arraj United States District Court, 901 19th Street, Denver CO 80294. At this hearing, the Plaintiff Melissa Mellott shall be present in person along with her counsel, Jack Olsen.  Defendant's counsel shall also be present. **Plaintiff Melissa Mellott shall bring with her to this hearing her United States Passport that she used on July 7, 16, 21 and August 8, 9, and 16, 2010, while she was in Germany.** The parties are on notice that this court may call and question Melissa Mellott as a witness during this hearing pursuant to Fed. R. Evid. 614 (a) and (b).

3

(Docket no. 106) (emphasis in original);[1]

5.     That on October 25, 2010, Plaintiff's Motion to Reset the October

27, 2010 Hearing Before the Magistrate Judge to December 21,

2010 (docket no. 118) was filed with the court.  Attached to this

motion was a Declaration of Melissa Mellott Pursuant to 28 U.S.C.

1746 (docket no. 118-1);

6.     That in Plaintiff's Declaration (Affidavit) (docket no. 118-1), Plaintiff

states under penalty of perjury the following:

I, Melissa Mellott, state as follows:

1.     I am the plaintiff in this case.

2.     I have been informed of the hearing on October 27,
2010 and also of the hearing on December 21, 2010.
I have been informed that I am required to be at both

---

[1]Plaintiff's travel was placed in issue by the Plaintiff as a result of her repeated claims that she was in Germany at the time.  For example, in Plaintiff's Motion for Forthwith Hearing on Plaintiff's Motion to Seal (docket no. 77 at 2, ¶7), Plaintiff represented, through counsel, that "[t]here is a special urgency to this request, because plaintiff and her husband have been flown to Germany, where he has been assigned to another sensitive role in the military (and involving security of the United States)."  Thereafter, Plaintiff sought a two-day enlargement of time to respond to the motion for attorney's fees and costs because she was "presently in Germany because of her husband's assignment overseas in the United States Air Force.  Plaintiff's belongings, having been shipped from the United States, have arrived, and she is gathering documents to be attached to the responsive brief. . .. .  Part of the reason for delay is that plaintiff does not have scanning or FAXing ability from Germany (at her home) . . . ." (Docket no. 93 at 1-2, ¶ 5).  Furthermore, in her opposition to Defendant's motion for attorney's fees and costs (docket no. 98), and in her Declaration filed in support of such opposition, Plaintiff claims that redacted banking records from July 7, 16, 21, August 8, 9, and 16, 2010, confirm multiple transactions she made at various locations in Germany.  Significantly, such banking records do not show that the transactions were made in this calendar year or who made the transactions.  (Docket no. 98-1 at 4-8).  Therefore, the court sought additional evidence of the Plaintiff's travels, namely her United States Passport that she used at that time.

4

hearings in Denver federal court.

3.  I am unable to attend the hearing on October 27, 2010 for the following reasons (and therefore respectfully request that it be continued to December 21, 2010, which is the date of the other hearing).

4.  I was fired from my job with the defendant corporation.

5.  I then tried hard to find work.  With six children and a husband in the military, it is imperative that I generate an income for my family.

6.  The defense attorneys in this case destroyed my ability to obtain work by contacting my former employers to inform them of this litigation.  The tactic worked.  My ability to find work has been destroyed.

7.  I moved to Germany in preparation for my husband's reassignment there.  I also moved my six children there.  My address in Germany was 447 AFOSI APO, AE.

7[sic]. In an effort to find employment and somehow resume my career, I thereafter had to move to London on September 3rd.  My residential address is presently Melissa Mellott, Hamilton House-Mabledon Place, Bloombsbury London WC1H 9BB, UK.

8.  Our six children moved with me to London.  Hopefully, my husband will be able to join me there later.

9.  I have no funds with which to purchase an airline ticket back to the [sic] Denver from London for the October 27, 2010 hearing.  I have no funds with which to pay for my own airline ticket let alone tickets for my six children.

10. In an attempt to resolve this issue, my attorney has made a firm offer to the defendant on my behalf to simply dismiss the case with prejudice.  However, the defense attorney has refused the offer.

11. I have been informed that I cannot appear by

telephone.

12.    I can reasonably anticipate that I will be able to travel from London to Denver for the December 21, 2010 hearing.  I will be able to pull together enough funds by then to purchase an airline ticket for myself, and hopefully my husband will have joined me by then to take care of the children.  Either that, or I will be able to purchase airline tickets for the children as well.

13.    In any event, I affirm that I will ensure that I am present for the December 21, 2010 hearing.

14.    Appearing for two different court hearings on two different dates 60 days apart will create a hardship for me that I simply cannot overcome.  Again, I cannot pay for a ticket to fly to Denver for the October 27, 2010 hearing, and I have no resources with which to also fly in my children or arrange for some sort to 24-hour care for them in London.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 22nd day of October 2010.

S/Melissa Mellott
Melissa Mellott

(Docket no. 118-1);

7.    That on October 25, 2010, Magistrate Judge entered the following

minute order:

It is hereby ORDERED that Plaintiff's Motion to Reset the October 27, 2010 Hearing before the Magistrate Judge to December 21, 2010 (docket no. 118) is DENIED.

This court set the October 27, 2010 Hearing on September 21, 2010.  See minute order (docket no. 106).  Plaintiff has waited until two (2) days before the hearing to continue such hearing.  I do not find good cause shown to continue. Moreover, there is conflicting evidence that has been submitted by the parties concerning Plaintiff's physical

presence on July 7, 16, 21 and August 8, 9, and 16, 2010 and thus Plaintiff needs to be present, in person, for this hearing and needs to bring her United States Passport with her to this hearing that she used on July 7, 16, 21 and August 8, 9, and 16, 2010.  See minute order (docket no. 106).  In [sic] should be noted that nothing is preventing the Plaintiff from filing her Motion to Dismiss with Prejudice as suggested that she would do in the subject motion (docket no. 118, paragraph nos. [sic] 2).  As of the date of this minute order, no such motion to dismiss with prejudice has been filed by the Plaintiff.

(Docket no. 120);

8.      That on October 26, 2010, Plaintiff's Motion to Dismiss with

Prejudice (docket no. 121) was filed with the court.  This motion

states:

PLAINTIFF MELISSA MELLOTT, by her attorney, Olsen & Brown, LLC, moves to dismiss the case with prejudice, and as grounds therefor states as follows:

1.      Defendant's position: The defendant's attorney has expressed opposition to such dismissal unless plaintiff pays defendant's attorney's fees.

2.      Plaintiff has instructed her attorney to file this motion. It is understood by the plaintiff that if granted, the dismissal would be with prejudice.

3.      Plaintiff has been ordered to appear in person on October 27, 2010 for a legal fee hearing before the Magistrate Judge.

4.      Plaintiff is overseas and presently in London with her six children.

5.      Plaintiff has been desperately seeking work to support her family and simply survive.  Her husband is an enlisted man in the U.S. Air Force.

6.      Plaintiff has been trying to earn and save sufficient money to fly back to Denver with her children for the

7

October 27, 2010 hearing.  She has been unable to come up with the financial resources to attend the hearing, although she thought she could.  But she has failed to do so and has other financial resources available to her and her children.

7. The Court recently scheduled an additional hearing on December 21, 2010, and plaintiff has been ordered to appear for that hearing in person also.  Plaintiff believed that she would, with certainty, have sufficient funds to fly back to Denver by then.

8. Thus, plaintiff filed a motion to reset the October 27, 2010 for December 21, 2010 (thus, both hearings on the same day).  This seemed like a fair solution.

9. But the Magistrate Judge denied the motion. Nonetheless, plaintiff still does not have the financial ability to travel back to Denver for the October 27, 2010 hearing.

10. For this and other reasons, plaintiff has asked that her case be dismissed with prejudice."

WHEREFORE, Plaintiff respectfully moves to dismiss the case with prejudice.

RESPECTFULLY SUBMITTED,
OLSEN & BROWN, LLC

BY s/John R. Olsen

(Docket no. 121);

9. That on October 26, 2010, Plaintiff's Motion for Reconsideration of

the Magistrate Judge's Order Denying Her Motion to Reset the

October 27, 2010 Hearing (docket no. 122) was filed with the court.

This motion states:

PLAINTIFF MELISSA MELLOTT, by her attorney, Olsen & Brown LLC, moves for reconsideration of the Magistrate Judge's Order denying her motion to reset the October 27,

8

2010 hearing, and as grounds therefor states as follows:

1.      Defendant's position: The defendant's attorney has
        opposed plaintiff's request to reset the October 27,
        2010 hearing to December 21, 2010.

2.      It [sic] his Order denying plaintiff's motion to reset the
        October 27, 2010 hearing, the Magistrate Judge
        pointedly called attention to plaintiff's failure to file a
        Motion to Dismiss with Prejudice.

3.      Plaintiff has now done so.

4.      To the extent that this factor made a difference to the
        Magistrate Judge in his ruling (which it must have,
        considering the attention paid to it by the Magistrate
        Judge), the fact has now changed, thus supporting
        the instant Motion for Reconsideration.

5.      Plaintiff, despite her best efforts, has been unable to
        accumulate sufficient financial resources to fly herself
        and her six children back from London for the October
        27, 2010 hearing.  Just a few days ago the Court
        scheduled an additional hearing on December 21,
        2010 (with plaintiff ordered to be present), and it
        would be fair to schedule the hearings on the same
        day, especially since they are premised upon the
        same allegations by the defense attorney.

6.      Now there is an additional reason to grant plaintiff's
        motion to reset, that being the possibility that the case
        will be dismissed with prejudice.

        WHEREFORE, Plaintiff respectfully moves for
reconsideration of the Magistrate Judge's Order denying her
motion to reset the October 27, 2010 hearing before the
Magistrate Judge to December 21, 2010 (in the afternoon).

                              RESPECTFULLY SUBMITTED,
                              OLSEN & BROWN, LLC

                              S/ John R. Olsen

(Docket no. 122);

10.     That on October 26, 2010, Judge Brimmer referred Plaintiff's

9

Motion for Reconsideration of the Magistrate Judge's Order Denying Her Motion to Reset the October 27, 2010 Hearing (docket no. 122) to Magistrate Judge Watanabe for ruling.  See docket no. 124;

11.  That on October 26, 2010, Magistrate Judge entered the following minute order concerning Plaintiff's Motion for Reconsideration of the Magistrate Judge's Order Denying Her Motion to Reset the October 27, 2010 Hearing (docket no. 122).  This minute order states:

> It is hereby ORDERED that Plaintiff's Motion for Reconsideration of the Magistrate Judge's Order Denying Her Motion to Reset the October 27, 2010 Hearing (docket no. 122) is DENIED.  As of the date of this minute order, this case has not been dismissed.  Accordingly, I find no basis in law or fact to grant the relief sought in this motion.

(Docket no. 125);

12.  That at the beginning of this hearing on October 27, 2010, the parties stipulated into evidence Defendant's exhibits B and D.  The court approved this exhibit stipulation;

13.  That Plaintiff **failed to appear** for this hearing on October 27, 2010, even though she was expressly ordered to appear.  See record of proceeding of October 27, 2010; the court's findings on Plaintiff's failure to appear; and this court's minute order, docket no. 106, ordering Plaintiff to be present in person for this hearing.  Plaintiff's current husband, Jason Mellott, testified that Plaintiff was in

10

Colorado currently but decided not to come to court because she would lose her job.  Clifton Wiser, who was a former co-worker with Plaintiff, testified that he physically saw Plaintiff working at Dish Network in Colorado the previous Monday, October 25, 2010, and in fact took a photo with his cell phone on October 25, 2010, of Plaintiff working at Dish Network in Colorado.  See Defendant's exhibit M;

14.    That on October 27, 2010, the hearing on Defendant MSN Communication's Inc.'s Motion for Attorney Fees and Costs (docket no. 85) began.  Magistrate Judge Watanabe entered an Sequestration of Witnesses Order at the beginning of this hearing. At this hearing, Plaintiff Mellott's current husband, Jason Mellott testified, *in pertinent part*, as follows: See (docket no. 139)


**QUESTIONS AND ANSWERS ON DIRECT EXAMINATION BY DEFENDANT'S COUNSEL, MS. WALKER**


**TESTIMONY OF JASON MELLOTT**

Q.    Mr. Mellott, would you give us the names of your six children and their ages, please.

A.    Yes.  Andrew is 13; Bradley is 11; Cameron is 7; Alexa and McKenna are 5, they're twins; and then

11

Steal is 2.

. . .

Q    So you married in November, 2007?

. . .

A.    October 2007, three years.

Q.    And of those six children, how many of them are you the biological father of?

A.    One.

Q.    Steal?

A.    Correct.

**See docket no. 139, at page 20, Lines 3 - 7, 10 - 11, 14 - 18.**

Q.    Did you see Steal this morning?

A.    I did.

Q.    Where did you see her?

A.    At home.

Q.    How about the other five kids?

A.    I did.

Q.    Did you see them yesterday?

A.    I did.

Q.    Did you see them Monday?

A.    I did.

Q.    To your knowledge have your children been outside of

12

the US in the last month?

A.    No.

Q.    No, you don't know or no, they have not?

A.    No, they have not.

Q.    Your children ever been to London, sir?

A.    No. Not that I know of.  I don't know.

Q.    Would you know if your children had been to – at

      least in the three years that you've been married to

      Melissa Mellott, would you be aware if your children

      had been to London?

A.    No, they have not.

Q.    Where's your wife this afternoon?

A.    Something with her work.  I do not know exactly

      where she's at.

Q.    And where does she work?

A.    Once again, I'm going to protect my wife on that,

      because your client's already got my wife fired from

      one job, I'm not going to get her fired from another

      one. She's the financial person in my -- of our

      household.

. . .

A.    She works for a company --I don't know the name of

      it, she works for a company in a different state, but I

13

do not know the name of it. I've never seen a

paycheck or nothing, so–

. . .

Q.    And prior to that she worked for Qwest

Communications; is that correct?

A.    Correct.

Q.    And she worked for Qwest for approximately a year?

A.    I believe longer than that.

Q.    Longer than that?

A.    I believe so.

Q.    That was here in Denver, correct?

A.    Correct.

Q.    She was an employee of Qwest?

A.    Correct.

**See docket no. 139, at page 21, Line 25; page 22, Lines 1**

**- 25; at page 23, Lines 1-4, 9 - 12, 19 - 25; page 24, Lines**

**1 - 4**.

Q.    So, you maintain that Jennifer Weiss is an associate

of your wife and not actually your wife; is that correct?

A.    Not that I know of.  She just said she had a person

that could take care of it.

Q.    So is it possible your wife could have represented

14

herself as Jennifer Weiss and you wouldn't know about it?

A.     I would not know.

Q.     But she led you to believe that this was a separate individual?

A.     I was told it was somebody that could take of it.

Q.     Now, do you understand, sir, that you've been subpoenaed to testify here today because your wife has made several statements to this Court that you have been assigned by the Air Force to Germany some time in the last four months?

A.     I do not know anything about being assigned to Germany in the last four months.  I have been trying to get assigned to Germany, correct.  I have not actually been assigned, I've been attempting to.

Q.     Are you aware that she has signed a declaration under penalty of perjury stating that the two of you were in Germany on July 29th, 2010, having recently been reassigned there by the military?  Are you aware of that?

A.     I'm not aware, no.

Q.     That wasn't accurate if that is what her declaration says, correct?

15

A.    Correct. We --

Q.     You were not in Germany in July, were you?

A.    No. Not in July, no.

Q.    And you have not been assigned by the Air Force to Germany at any time in 2010, have you?

A.    Not in 2010, no.

Q.    Have you even been to Germany any time in 2010?

A.    No.  It was the end of December I was there.

Q.    December, 2009?

A.    Correct.

Q.    Were you in Germany in July or August of 2009?

A.    Not Germany, no.  Oh, 2009?

Q.    Yes, sir.

A.    I was in Iraq.

Q.    In July and August, 2009?

A.    Correct.

**See docket no. 139, at page 39, Lines 4 - 25; page 40, Lines 1 - 24.**

Q.    When did you do operations in Germany?

A.    2002 to 2004-ish time frame.  I was stationed in England at that time.

**See docket no. 139, at page 42, Lines 1 - 3.**

16

Q.     When was the last time you saw your wife?

A.     This morning.

Q.     And did you talk about coming to court today?

A.     I asked her if she was coming to support me in any
       way and she had somewhere she had to be for work
       or she was going to get fired if she was not there.
       And, obviously, if she gets fired then I can't feed my
       six kids.

Q.     So it's your understanding she's not here today
       because she has some work-related conflict?

A.     Absolutely.

**See docket no. 139, at page 42, Lines 16 - 25; page 43,
Line 1.**

Q.     Who tends to your children while she's in Europe and
       you're extremely busy at your job?

A.     Whether it be family friends or my parents.  Or my
       oldest is 13, so if it's a couple hours -- he's 13, so it's
       only during the day.  It's never overnight.

Q.     So when your wife was in Germany for some period
       of time longer than a week, who was tending to your
       children, sir?

A.     I'm still home at night.

Q.     During the day?

17

A.    Correct.

Q.    Who's tending to them during the day after school?

A.    My 13 year old.

Q.    She watches all the other kids?

A.    He.

Q.    He, I'm sorry.

A.    Yes.  It's never overnight, so it's legal by the state of

Colorado.  We've checked.

**See docket no. 139, at page 44, Lines 22 - 25; page 45,**

**Lines 1 - 14.**

Q.    So for the last 18 months you've been trying to seek

reassignment to Germany?

A.    Yes.

Q.    And is that also because of concerns about your

children's safety?

A.    Absolutely.  And also just because of this, obviously.

**See docket no. 139, at page 46, Lines 4 - 9.**

Q.    It's correct, isn't it, that you are stationed at the Air

Force Academy with no present permanent chance of

station orders elsewhere?

A.    Correct, as of now.

Q.    Mr. Mellott, your wife has submitted a statement

18

under oath to the Court two days ago that says she

moved to Germany in preparation for her husband's

reassignment there.  You don't have any present

reassignment, do you?

A.     No, I've been applying for one.

Q.     And it's not correct that your wife has moved to

Germany, is it?

A.     She travels back and forth but, no, not as officially

moved, no.

Q.     She said that she also moved her six children to

Germany.  That's not correct, is it?

A.     No.

Q.     And she says her address in Germany was 447

AFOSI APO, comma, AE.  That's not her present

address, is it?

A.     What was the address again?

Q.     447 AFOSI APO, AE.

A.     That's not even -- 447 --

Q.     It's not even a valid address, is it?

A.     I don't know.  AFOSI is who I work for.

Q.     But that's not her - -

A.     And APO AE would be a European address but, no.

Not that I know of, no.

19

Q.    It's not her current address, is it?

A.    No, her current address is at my house.

Q.    And she's never lived at that address in Germany in
      the last month, has she?

A.    No.

Q.    She also stated in an affidavit submitted to the Court
      on Monday that on September 3rd, she moved to
      London.  That's not correct, is it?

A.    No.

Q.    And she says that her present residential address is
      Hamilton House, Marble - - Mabledon Place, excuse
      me, M-A-B-L-E-D-O-N, Bloomsbury, London?

A.    I do have an address there, yes.

Q.    You have an address there?

A.    We do, yes.

Q.    You have a business address there?

A.    Correct.

Q.    Because that's an office building, correct?

A.    Correct.  Oh, I think so.

Q.    It's not a residential address, correct?

A.    I don't know.  Honestly, I don't know.  I haven't been
      to that address, so I don't know.

Q.    Well, when you say "we" have an address there,

20

who's "we"?

A.     My wife and I.

Q.     What do you use the address in London for?

A.     For mail and things like that.

Q.     Why do you have a London mail address?

A.     Is that against the law?

Q.     I'm just asking why.

A.     That's something that she felt needed to be done with

work and everything else, so I said fine.

Q.     How long have you had that London address?

A.     A couple of months, I think.

Q.     But it's not a residential address, though, correct?

A.     Not that I know of, no.  I can't give you a yes or no.  I

haven't been in that specific address, so I don't know.

Q.     It's not your wife's present residential address, is it,

sir?

A.     No.  That's not where she sleeps, no.

Q.     She also stated in this declaration that she moved

your six children from Germany to London.  That's not

correct, is it?

A.     No.

Q.     And she stated that she could not appear at the

hearing today because she did not have sufficient

21

funds to purchase an airline ticket back to Denver

from London.  But it's correct, is it not, sir, your wife is

not in London this week?

A.      No.  She's not in London this week, no.

Q.      She hasn't been in London in the last month, has

she?

A.      Not that I know of.

Q.      Not in the last - -

A.      I don't know.

Q.      She hasn't been in London in the last two months that

you know of?

A.      Not that I know of. She's been on trips back and forth,

so I don't know where she has gone and where she

hasn't.

Q.      But you know she has not been in London in the last

week, correct?

A.      Not in the last week, no.

Q.      She's been here in Colorado?

A.      Yes.

Q.      Every day?

A.      That I know of, yes.

Q.      And she's here in Colorado today?

A.      She is at work, yes.

22

**See docket no. 139 at page 49, Lines 8 -25; page 50,**

**Lines 1 - 25; page 51, Lines 1 - 25; page 52, Lines 1 - 25;**

**page 53, Lines 1 - 4.**

Q.      Mr. Mellott, I've handed you an exhibit that's been

        marked as Defendant's Exhibit L.  Do you recognize

        that?

A.      I do.

Q.      What is it?

A.      It is an invitation for a Halloween party.

Q.      Is that a Halloween party you and your wife are

        hosting?

A.      Yes.

Q.      Is that your current address?

A.      Looks like it, yes.

Q.      And this is the property that you rented?

A.      Correct.

Q.      And this invitation is available on the internet.  Are

        you aware of that?

A.      It is sent - - she did it.  It was sent to  - - there is a link

        and it was sent to my co-workers.

Q.      And it also provides that you can forward it on to other

        people.  Do you see that?

23

A.     Correct.

Q.     Is there any instruction in there to people that they
       should keep your address confidential?

A.     It was sent to - - the only people it was really sent to is
       my co-workers and if anybody that's associated with
       me, my co-workers and their friends know what we do
       for a living.

Q.     And this a party you're hosting this Saturday?

A.     Yes.

Q.     How long ago was this invitation sent out?

A.     Like a week ago, two weeks ago.  I'm not sure.  She
       did it.

**See docket no. 139, at page 53, Lines 15 - 25; page 54,
Lines 1 - 20.**

**QUESTIONS AND ANSWERS ON CROSS EXAMINATION
BY PLAINTIFF'S COUNSEL, MR. OLSEN**

Q.     It sounds like you have been applying to go to
       Germany.  Is that fair?

A.     Correct.

Q.     And why is that?

A.     One, **to protect my wife and family from not only
       this**, but her ex-husband who's very dangerous.

24

Also, I grew up there, so it's a place that I feel safe,
and somewhere my kids and my wife would feel safe.

Q.      Do you have reason to believe - - have you had
reason to believe recently that orders would soon
come through for Germany for you?

A.      Yes, I'd hope so, yes.

**See docket no. 139, at page 58, Lines 13 - 24.**

Q.      So how do you know that you won't get sent back to
Iraq?

A.      If I don't get orders to Germany I will be sent back to
Iraq here very shortly, probably this summer.

Q.      And so when is it, if you recall, that your wife first went
to Germany in preparation for your reassignment
there?

A.      Oh, wow.

Q.      If you're able to trace back that far.

A.      Probably 18 months ago, probably, back and forth.
She's been communicating and traveling.

**See docket no. 139, at page 59, Line 25; page 60, Lines 1
- 10.**

Q.      Okay, just to clarify the record.  You have adopted the
twins, have you?

25

A.      Cameron and the twins.

Q.      So you - - you have three - - legally three children?

A.      Four.  Legally four.

Q.      Four of your - -

A.      Steal.

Q.      - - of your own?

A.      One biological and three adopted.

**See docket no. 139, at page 62, Lines 17 - 25.**

Q.      And you mentioned the establishment in London.  Did
        you say that you believe that your wife had, on
        occasion, been sleeping there as a weigh station?

A.       I honestly don't know what she's done at that
        address.  I know we have mail that goes there, that's
        about all I know about that address.

Q.      And so do you - - are you able to tell the Court
        whether she has not been in London?

A.      I can't tell you, no.

Q.      So you really don't know where she's been traveling
        in your  - - for sure?

A.      No. She - - she was gone for like two months - - or
        two weeks in September.  She travels often just like I
        do.

Q.      And this is in connection with her work?

26

A.      Correct.

**See docket no. 139, at page 65, Lines 6 - 22.**

Q.      But you've only applied for Germany?

A.      I've only applied for Germany at this time.  Oh, and - -

yes.  I think maybe Italy.

**See docket no. 139, at page 66, Lines 6 - 8.**

Q.      You filed a complaint against Major Williams for some

reason?

A.      I'm about to, yes.

Q.      And what reason would that be?

A.      Because I've been told that he has lied to this Court.

And if he's given away any information about me

without my permission that is against Air Force rules,

and from what I've been told he has.  So I'm going to

get, obviously, what records I can from - - after this

court or whatever and go from there.

**See docket no. 139, at page 66, Lines 23 - 25; page 67,**

**Lines 1 - 7.**

**REDIRECT EXAMINATION BY DEFENDANT'S COUNSEL,**

**MS. WALKER**

Q.      You said in response to Mr. Olsen's questions that

you can't say for certain whether or not your wife's

27

been in London recently?

A.   I can't, no.

Q.   But you can say for certainty that she's not been out of Colorado in the last week, correct?

A.   Correct.

Q.   And you also can say for certainty that she was in Colorado on September 30th when she handed you that letter of authorization to sign with respect to Jennifer Weiss, correct?

A.   I'm thinking.  She'd been out of town recently before that, so I'm trying to remember if she e-mailed it to me or if she handed it to me.  I'm trying to remember. (Inaudible) that was the week I was doing a detail and she was out of town pretty sure that week.  I can't say a hundred percent sure if she e-mailed it to me or if she printed it out and gave it to me.

Q.   How about the day that you were served?  Was she in town that day?  I imagine that day sticks out in your mind.

A.   I believe so, yes.

Q.   Okay.  So as you sit here today the only reason that you anticipate that assignment is because you have been at your present assignment for 18 months, and

28

as you testified it's time for you to move on?

A.    I've been at my current assignment for over three years, so it's definitely time to move on. And if not, I separate from the Air Force within the next year. So, if the Air Force won't get me to Germany, I'll separate and move to Germany myself.

Q.    But it's correct nobody's told you and you haven't received any notification that you have been assigned overseas?

A.    No. Not yet, no.

Q.    Now, you said that your wife has found a job or been offered a job in Europe?

A.    Yes.

Q.    And where is that job that she's been offered?

A.    I just know it's in Germany. I don't know anything about the company or anything, I just know it's in Germany.

Q.    And is it a job doing what she currently does?

A.    Everything is with her job she currently does, yes. So IT stuff.

**See docket no. 139, at page 67, Lines 15 - 25; page 68, Lines 1 - 11 and 24 -25; page 69, Lines 1- 21.**

Q.    Now, you said that you are looking to move overseas

to protect your wife from this?

A.    Correct.

Q.    Are you talking about this lawsuit?

A.    Absolutely.

Q.    What do you mean?  Protect her from what?

A.    Because she's already gotten fired from one job

because of this lawsuit, so the furthest we can get

away from your client the better.

Q.    She got fired from what job?

A.    Correct.

Q.    Which job?

A.    Or not fired.  I'm sorry, she was not fired.  It started

getting really difficult at her work, so she found a

different job.  She was not officially fired, no.

Q.    Okay.  Which - -

A.    Qwest.

Q.    She found it difficult at Qwest and so she - -

A.    Because - - yes, because your office was constantly

hounding Qwest for her files.  Yes.

Q.    That's what she told you?

A.    Yes.

Q.    And so she found a new job?

A.    Correct.

30

Q.      And so you want to move to Europe.  How is that

        going to protect her from this litigation, in your

        understanding?

A.      Because it's a lot harder for your client to reach

        somebody in Europe.  And Germans really don't care

        about that kind of stuff.  Americans are different.  I

        grew up there, so - - a little different.

Q.      When did you first start making plans to move to

        Europe to protect her from the lawsuit?

A.      The lawsuit and also her ex-husband as well.  It's

        both.

Q.      Okay.  In connection with the lawsuit, when did you

        first start making plans to move to Europe?

A.      Eighteen months ago.

Q.      So that was before she filed the case?

A.      We've know this case was coming (inaudible) before

        she even filed it.  Since the day she was fired we

        knew this was coming.

Q.      Okay. If she's concerned then why did she file the

        lawsuit?

A       Because - -

A.      Because your client did something wrong and he

        needs to fess up to it, so that's why.  He can't keep

31

doing what he's doing to people.  That's why the

lawsuit's come out.

**See docket no. 139, at page 70, Lines 14 - 25; page 71,**

**Lines 1 - 25; page 72, Lines 1 -  9 and 14 - 17.**

Q.     And is it your understanding that the military also

gave your wife an alternate Social Security number in

order to protect your location?

A.     The military?

Q.     Yes.

A.     No.

Q.     So, you didn't know that that's what she's represented

to this Court that she was provided an alternate Social

Security number by your commander in order to

protect your location?

A.     No.  My (inaudible) commander, no.

Q.     She never told you that?

A.     No.

Q.     And to your knowledge that would not happen,

correct?

**See docket no. 139, at page 73, Lines 9 - 23.**

That at the conclusion of Mr. Mellott's testimony, Plaintiff's counsel,

Mr. Olsen, wanted to make a record before Mr. Mellott left the

32

courtroom.  Magistrate Judge Watanabe allowed Mr. Olsen to make a record while Mr. Mellott was still in the courtroom.  Mr. Olsen made the follow comment:

> MR. OLSEN: Your Honor, while they're conferring, and maybe they can listen too before Mr. Mellott leaves the courtroom.  Your Honor, I would like to state in Mr. Mellott's presence that I would encourage him to get a hold of his wife as soon as he leaves the courthouse, have her get here if she's nearby, and if not, get here tomorrow morning.  And I just wanted to make that clear before he leaves the courtroom that that would be enormously helpful.  Thank you, Your Honor.

> **See docket no. 139, at page 76, Lines 5 - 14.**

**TESTIMONY OF CLIFTON WISER**

**QUESTIONS AND ANSWERS ON DIRECT EXAMINATION**

**BY DEFENDANT'S COUNSEL, MS. WALKER**

Q.      Mr. Wiser, where are currently employed?

A.      I am currently employed at MSN Communications.

Q.      And what's your position there?

A.      I am the solution manager.

Q.      Are you familiar with Melissa Mellott?

33

A.     I am.

Q.      How do you know Ms. Mellott?

A.      Melissa and I worked together for some time.

Q.     And during the time that you worked with her at MSN
Communications were your work spaces in close
proximity?

A.     Yes. Absolutely adjacent.

Q.     So, you would recognize her if you saw her?

A.     Without a doubt.

Q.     Mr. Wiser, I want to direct your attention to Monday of
this week.  Did you have an occasion on Monday of
this week to visit the offices of Dish Network in
Englewood in connection with MSN business?

A.     Yes.

Q.     And at what time of day did you arrive at Dish
Network?

A.     It was shortly after 2:00 in the afternoon.

Q.     And while you were there did you see Melissa
Mellott?

A.     I did, in fact, yes.

Q.     Where did you see her?

A.     She was working in a cubical [sic] near the - - what's
called the voice team.  Voice services, first floor on

34

the northwest wing of the second building.

Q.     And what did you - - what was she doing at the time
       that you observed her?

A.     The activity she was working on, it appeared she had
       some sort of Excel spreadsheet open and was doing
       what appeared to be configuration work around a
       product called Call Manager.  I observed her sending
       what looked  - - appeared to be a text message.

Q.     Mr. Wiser, I have handed you a photograph that's
       been marked as Exhibit M.  Can you identify that?

A.     I can.  This a photograph I took, at the time I was at
       Dish Network's offices on Monday of this week, with
       my cell phone.

Q.     And who is it that's depicted in the photograph?

A.     The photograph depicts Ms. Mellott.

**See docket no. 139, at page 77, Lines 17 - 20; page 78,
Lines 2 - 6 and 13 - 17; page 79, Lines 8 -  25; page 80,
Lines 1 - 5 and 13 - 20.**

Exhibit M was admitted into evidence.

**See docket no. 139, at page 80, Line 25.**

THE COURT: Cross-examination Mr. Olsen?

MR. OLSEN: We have none. Thank you, Your Honor.

35

**See docket no. 139, at page 81, Lines 12 -14.**

15.    That as a result of Plaintiff's **failure to appear** on October 27, 2010, this court issued an Order to Show Cause (docket no. 131) and set a Show Cause Hearing on December 21, 2010, at 10:30 a.m.;

16.    That Magistrate Judge Watanabe did not complete this hearing on October 27, 2010, and it was set over to December 21, 2010, at 10:30 a.m.;

17.    That on October 28, 2010, Defendants filed the subject motion (docket no. 126);

18.    That on October 28, 2010, Judge Brimmer referred to Magistrate Judge Watanabe the subject motion (docket no. 126) for ruling. See docket no. 127;

19.    That on October 28, 2010, Magistrate Judge Watanabe entered the following written order captioned "Order Regarding MSN Communications, Inc.'s Motion for Court Order to Plaintiff to Surrender Passport, and for Expedited Ruling (D.N. 126)." This Order (docket no. 129) states:

THIS MATTER, coming before the Court on MSN's Motion for Court Order to Plaintiff to Surrender Passport, and for Expedited Ruling, the Court, being fully advised in the premises;

HEREBY ORDERS that Plaintiff may have until November 2, 2010 to submit her response to MSN Communication's Inc's Motion, and MSN Communications,

36

Inc. may then have until November 4, 2010 to reply.  The Court will then take the matter under advisement for ruling.

DONE this 28th day of October, 2010.

BY THE COURT

s/ Michael J. Watanabe
MICHAEL J. WATANABE
U.S. Magistrate Judge
District of Colorado

(Docket no. 129);

20.    That on October 29, 2010, Judge Brimmer entered the following

Order (docket no. 130):

This matter is before the Court on plaintiff's motion to dismiss with prejudice [docket no. 121].  Pursuant to Federal Rule of Civil Procedure 41(a)(2), "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper."  Plaintiff seeks to have the Court dismiss the action with prejudice.  Defendant objects to any dismissal that would require it to pay it own fees and costs because of its pending motion requesting certain fees and costs [docket no. 85] and its request for all of its attorney's fees and costs within its motion to dismiss [docket no. 51].  A dismissal, however, does not prevent the Court from resolving these and other such collateral matters.  Upon granting plaintiff's request for dismissal of her complaint, the Court will retain "jurisdiction to 'consider collateral issues' including 'an award of counsel fees.'" *Lorillard Tobacco Co. v. Engida*, 611 F.3d 1209, 1218 (10th Cir. 2010) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395 (1990)); *see Qureshi v. United States*, 600 F.3d 523, 525 (5th Cir. 2010)("For example, the court may, notwithstanding dismissal of the underlying action, impose sanctions under Federal Rule of Civil Procedure 11, impose costs, impose attorney's fees, or undertake contempt proceedings.") (citations and footnote omitted). Consequently, it is

**ORDERED** that plaintiff's motion to dismiss with prejudice [docket no. 121] is GRANTED.  Plaintiff's

37

complaint is dismissed with prejudice.  It is further

**ORDERED** that judgment shall not enter until the Court resolves the collateral issues still pending in this matter.  It is further

**ORDERED** that defendant's motion to dismiss [docket no. 51] is denied as moot.  It is further

**ORDERED** that defendant is granted leave to file a separate and updated motion seeking its attorney's fees and costs on or before November 22, 2010, such motion not to exceed 15 pages.  Plaintiff may file a response on or before December 6, 2010, such response not to exceed 15 pages. On or before December 13, 2010, defendant may file a reply which does not exceed 10 pages.  The Court will take up defendant's motion and any other relevant collateral issues at the hearing already set in this matter for 8:30 a.m. on December 21, 2010.  **Plaintiff is reminded that she has been ordered to attend the December 21, 2010 hearing**.

DATED October 29, 2010.

BY THE COURT

s/ Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge

(Docket no. 130) (emphasis added).

21.     That on October 29, 2010, Magistrate Judge Watanabe entered the

following Order to Show Cause (docket no. 131).  The Order to

Show Cause states:

This case is before this court pursuant to an Order of Reference to United States Magistrate Judge issued by District Judge Philip A. Brimmer on October 15, 2009. (Docket No. 2).

In a Minute Order entered on September 21, 2010 (Docket No. 106), this court set a motion hearing for October

27, 2010, at 2:30 p.m. in Courtroom A-502, Fifth Floor, Alfred A. Arraj U.S. Courthouse, 901 19th Street, Denver, Colorado.  In that Minute Order, this court specifically directed that "the Plaintiff Melissa Mellott shall be present in person along with her counsel, Jack Olsen."  (Docket No. 106).  In addition, this court ordered that "**Plaintiff Melissa Mellott shall bring with her to this hearing her United States Passport that she used on July 7, 16, 21 and August 8, 9 and 16, 2010, while she was in Germany.**"  (Docket No. 106) (emphasis in original).  Just prior to that hearing, Plaintiff Melissa Mellott acknowledged in a Declaration that she had been informed of the October 27 hearing and that she was required to be a that hearing.  (Docket No. 118-1 at 1, ¶ 2).  Nevertheless, and despite this court's clear directives, Plaintiff Melissa Mellott did not appear in person for the October 27 hearing, nor did she produce her United States Passport.

Plaintiff stated in her Declaration that she was unable to appear for the hearing, noting, *inter alia*, that she and her six children had moved to London, England, and she did not have the funds "with which to purchase an airline ticket back to the Denver from London for the October 27, 2010 hearing. I have no funds with which to pay for my own airline ticket let alone tickets for my six children."  (Docket No. 118-1 at 2, ¶¶ 7, 8).  The court heard testimony, however, during the October 27 hearing that the Plaintiff and her six children were in Colorado, not London.

Rule 41(b) of the Federal Rules of Civil Procedure provides in pertinent part:

> If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it. Unless the dismissal order states otherwise, a dismissal under this subdivision (b) and any dismissal not under this rule–except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19–operates as an adjudication on the merits.

Fed. R. Civ. P. 41(b).

Furthermore, Rule 16(f) provides in pertinent part that

39

"[o]n motion or on its own, the court may issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)-(vii), if a party or its attorney: (A) fails to appear at a scheduling or other pretrial conference . . . . or (C) fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f). Rule 37(b)(2)(A) (ii)-(vii), which is referenced in Rule 16(f), permits the following sanctions:

> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

> (iii) striking pleadings in whole or in part;

> (iv) staying further proceedings until the order is obeyed;

> (v) **dismissing the action or proceeding in whole or in part**;

> (vi) rendering a default judgment against the disobedient party; or

> (vii) **treating as contempt of court the failure to obey any order** except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A) (ii)-(vii) (emphasis added).  Rule 16(f)(2) further provides that "[i]nstead of or in addition to any other sanction, the court must order the party, its attorney, or both to pay the reasonable expenses–including attorney's fees–incurred because of any noncompliance with this rule, unless the noncompliance was substantially justified or other circumstances make an aware of expenses unjust."  Fed. R. Civ. P. 16(f)(2).

Based upon the foregoing, it is hereby

**ORDERED** that on **December 21, 2010, at 10:30 a.m.** (or immediately after the hearing before Judge Brimmer that morning if sooner) in Courtroom A-502, Fifth Floor, Alfred A. Arraj U.S. Courthouse, 901 19th Street, Denver, Colorado, a Show Cause Hearing will be held at which the **Plaintiff Melissa Mellott <u>shall appear in person</u>** and show

40

cause why this case should not be dismissed pursuant to Fed. R. Civ. P. 16(f) and/or 41(b), why a finding and order of contempt should not enter, and why Plaintiff should not be directed to pay defendant's reasonable expenses, including attorney fees, incurred because of Plaintiff's failure to appear as directed.

Dated:  October 29, 2010    s/ Michael J. Watanabe
        Denver, Colorado    Michael J. Watanabe
                            United States Magistrate
                            Judge

(Docket no. 131) (emphasis in original);

22.     That on October 31, 2010, Plaintiff filed a motion captioned:

"Plaintiff Moves to Withdraw Certain Pleadings and Averments that

Have Been Shown to Be False (And Which Were Submitted to the

Magistrate Judge) (docket no. 132).  This motion states:

        PLAINTIFF MELISSA MELLOTT, by her attorney, John R. Olsen, moves to withdraw certain pleadings and averments that have been shown to be false (and which were submitted to the Magistrate Judge), and as grounds therefor states as follows:

        1.      Efforts to Confer: Defendant's attorney has failed to state her position on this motion.

        2.      At a hearing before the Magistrate Judge on October 27, 2010, plaintiff's husband testified that plaintiff was in Colorado on that day, was working at a local company, and that the couple's six children were in Colorado (and had not moved to either Germany or England) with plaintiff.

        3.      Such testimony contradicted prior declarations by plaintiff that were submitted to the court.

        4.      It is important for plaintiff's attorney, as an officer of the court, to ensure that no such deceptions are perpetrated on the court and take all steps to ensure

that such deceptions are not perpetuated.

5.      In that effort, the undersigned has tried to communicate with plaintiff.  Getting no response, it is important that the undersigned immediately correct the record to the extent that any such deceptions have become apparent.

6.      Thus, with regard to plaintiff's declaration, Document #181-1, the undersigned moves to withdraw Paragraphs 3, 6, 7, 7 (sic), 8, 9, 12 and 14.  These averments starkly contradict the live testimony of plaintiff's own husband before the Magistrate Judge.

7.      With regard to plaintiff's declaration, Document 98-1, the undersigned moves to withdraw Paragraph 4 for the same reason.

8.      The undersigned also moves to withdraw certain averments in two motions filed by the undersigned, because, while based upon plaintiff's declarations, they appear to starkly contradict the live testimony of plaintiff's own husband.

9.      Thus, the undersigned moves to withdraw the following paragraphs from Plaintiff's Motion to Reset the October 27, 2010 Hearing Before the Magistrate Judge to December 21, 2010 (Document #118):  ¶¶ 2, 3, 6-9, and 12.

10.     The undersigned also moves to withdraw the following paragraphs from Plaintiff's Motion for Reconsideration of the Magistrate Judge's Order Denying Her Motion to Reset the October 27, 2010 Hearing (Document #122): ¶ 5.

        WHEREFORE, plaintiff respectfully moves to withdraw certain pleadings and averments that have been shown to be false.

                        RESPECTFULLY SUBMITTED,
                        OLSEN & BROWN, LLC

                        By: s/ John R. Olsen

42

(Docket no. 132);

23.   That on November 1, 2010, Judge Brimmer referred the above

motion captioned "Plaintiff Moves to Withdraw Certain Pleadings

and Averments that Have Been Shown to Be False (And Which

Were Submitted to the Magistrate Judge) (docket no. 132) to

Magistrate Judge Watanabe for ruling.  See docket no. 133;

24.   That on November 4, 2010, Magistrate Judge Watanabe, after

reviewing Defendant MSN Communications, Inc.'s Motion for Court

Order to Plaintiff To Surrender Passport and for Expedited Ruling

(docket no. 126), the response (docket no.135 ), and the reply

(docket no. 136), *in camera*, entered the following Order (docket

no. 137):

> It is hereby **ORDERED** that Defendant MSN
> Communications, Inc.'s Motion for Court Order to Plaintiff to
> Surrender Passport, and for Expedited Ruling (docket no.
> 126) **is set for hearing before Magistrate Judge
> Watanabe on Tuesday, November 9, 2010, at 1:30 p.m.** in
> Courtroom A-502, Alfred A. Arraj United States District
> Court, 901 19th Street, Denver, Colorado 80294.  At this
> hearing, the **Plaintiff Melissa Mellott shall be present in
> person along with her counsel Jack Olsen.**  Defendant's
> counsel shall also be present.  **Plaintiff Melissa Mellott
> shall bring with her to this hearing her current valid
> United States Passport, which she used on July 7, 16,
> 21, and August 8, 9, and 16, 2010, while she was in
> Germany.**  The parties are on notice that this court may call
> and question Melissa Mellott as a witness during this hearing
> pursuant to Fed. R. Evid. 614(a) and (b).

> It is further **ORDERED** that the Plaintiff Melissa
> Mellott is reminded that she has also been ordered to appear
> in person on December 21, 2010, at 8:30 a.m. before Judge

43

Brimmer for a motion hearing (see Docket No. 130) and immediately after that hearing before Magistrate Judge Watanabe (see Docket No. 131) for a Show Cause Hearing at which she shall show cause why a finding and order of contempt should not enter and why she should not be directed to pay defendant's reasonable expenses, including attorney fees, incurred because of her failure to appear as directed.

It is further **ORDERED** that the U.S. Marshal Service shall forthwith personally serve a copy of this Order upon the Plaintiff Melissa Mellott. Plaintiff's counsel shall also serve a copy of this Order on the Plaintiff' Melissa Mellott.

Done this 4th day of November, 2010.

BY THE COURT

s/ Michael J. Watanabe
Michael J. Watanabe
United States Magistrate Judge

(Docket no. 137) (emphasis in original);

25. That on November 5, 2010, Defendant MSN Communications, Inc's Motion to Compel Disclosures of Attorney Client Communications Pursuant to the Crime Fraud Exception (docket no. 140) was filed with the court;

26. That on November 5, 2010, Judge Brimmer referred Defendant MSN Communications, Inc's Motion to Compel Disclosures of Attorney Client Communications Pursuant to the Crime Fraud Exception (docket no. 140) to Magistrate Judge Watanabe for ruling. See docket no. 141. Later, Judge Brimmer withdrew this referral of docket no. 140. See docket entry (court only) dated November 10, 2010;

44

27.     That on November 9, 2010, Plaintiff Melissa Mellott finally appeared

before the court, in person, before Magistrate Judge Watanabe for

hearing on Defendant's Motion for Court Order to Plaintiff to

Surrender Passport, and for Expedited Ruling (docket no. 126).

See docket no. 143;

28.     That at the this hearing on November 9, 2010, Plaintiff Melissa

Mellott was sworn and testified, *in pertinent part*, as follows:

**QUESTIONS AND ANSWERS ON DIRECT EXAMINATION BY**

**DEFENDANT'S COUNSEL, MS. WALKER.**

Q.      Ms. Mellott, would please identify your present residence

address for the record.

A.      It's Hamilton House, Mabledon Place in London.

Q.      Your present address is in London?

A.      Yes, it is.

Q.      And how long have you lived there?

A.      For about three months.

Q.      And Hamilton Place.  Can you be more specific?  Is there a

flat number or something that you live there?

A.      No, it's a house.

**See docket no. 144, at page 4, Lines 14 - 23.**

Q.      Ms. Mellott, I've handed to you what I've marked as Exhibit

45

A, which is a pleading filed by your attorney on October 31st,

entitled, Plaintiff Moves to Withdraw Certain Pleadings and

Averments That Have Shown to Be False.  Have you ever

seen this document?

A.     No, I have not.

Q.     If you would please turn to the item that is tabbed as docket

no. 1 - - let's see, Docket No. 118.  Did you find that?

A.     118 or 118, dash, 1?

Q.     118, dash, 1.  Why don't you take a moment to review that

and tell me if you recall signing that declaration and

providing it to your counsel.

A.     I recall the document, yes, but it doesn't seem to look like my

signature, so I can't give you an answer for that.

Q.     So it's not your signature?

A.     I remember the document.  That particular version of my

signature I don't recall, but I remember the document, yes.

Q.     Did you prepare it?

A.     Did I prepare the document?  No, I did not.

Q.     Who prepared the document, if you know?

A.      My attorney.

Q.     So did you see a version of this document that you signed at

some point?

A.     I saw a version of the document, yes.  And I remember

signing it.  I don't remember signing it looking like that, but yes.

Q.  Where were you when you received this from your attorney?

A.  I was in London.

Q.  And did you sign it before or on October 22nd, 2010?

A.  Yes, it is around that date.  I don't specifically recall the exact day, but yes.

Q.  Then you transmitted it back to your attorney signed?

A.  Yes.

Q.  Do you see in the declaration there there is - - there are two paragraphs 7s on the second page.  Do you see that?  One that starts, I moved to Germany, and the second one starts, in an effort to find employment.  Do you see those two paragraphs?

A.  The two number 7s, yes, I do.

Q.  And the second one there is a sentence that reads, My residential address is presently Melissa Mellott, Hamilton House, dash, Mabledon Place.  Do you see that?

A.  Yes, I do.

Q.  Was that in the affidavit that you signed?

A.  Yes.

Q.  And that's the address you're testifying today is your residence?

47

A.      Yes.

**See docket no. 144, at page 6, Lines 20 - 25; page 7, Lines 1 -**

**25; page 8, Lines 1 - 24**.

Q.      - - is your husband lied two weeks ago when he told the

        Court that you do not reside in London?

A.      If that's what his testimony was, then yes.

**See docket no. 144, at page 9, Lines 17 - 19.**

Q.      Ms. Mellott, the passport that your counsel has just handed

        to me, is this the one that you have used for your travel back

        and forth to London in this month?

A.      From the US, yes.  Within Europe is a different passport

        because I'm on official government business.

Q.      Okay.  We'll talk about that.  Let's talk about your travel back

        and forth from the US to London. When did you travel back

        to Colorado for the hearing today?

A.      I actually landed on Sunday.

Q.      And you traveled from where?

A.      London through Geneva.

Q.      How long were you in London?

A.      This time, two weeks.

**See docket no. 144, at page 10, Lines 8 - 21.**

Q.      So just to clarify, Ms. Mellott, you left the US two weeks ago

for this most recent travel to Geneva?

A.    Well, actually, I was in another location for a government

client.  I went to London to Geneva.  Last time I left the

United States was three months ago.

Q.    So you've been in Europe for the last three months?

A.    On and off, yes.

Q.    Okay.  I want to talk about just the last two weeks that you

identified before. When was the last trip where you departed

the US for Europe?

A.    I'd have to still say three months ago.

Q.    You've been out of the country for three months?

A.    Yes. On and off.

**See docket no. 144, at page 13, Lines 6 - 19.**

Q.    I want to know when the last time you exited the US for any

reason.

A.    I came back for two days last week, left again on Thursday

and then back again on Sunday.

Q.    So, you left the US on Thursday, November 4th?

A.    Uh-huh.

**See docket no. 144, at page 14, Lines 1 - 6**.

Q.    And where did you travel to on November 4th?

A.    My portal of entry was in and out of Geneva.

49

Q.   **And so your testimony is that when you traveled from Geneva Switzerland to London you used a different passport than the one that I have?**

A.   **Yes. It's one issued by the British Government for official British work.  I'm not allowed to bring it here because it has no bearings here, unless I'm on a business with their client that is headquartered in Britain and has satellite offices here**.

Q.   **Do you have British citizenship?**

A.   **No, I do not.  It was issued under a work Visa.**

Q.   When was that?

A.   Probably about 18 months ago.

**See docket no. 144, at page 14, Lines 11 - 25.**

Q.   And so it's your testimony that as part of this contract, the British Government gave you some type of passport document that you use for travel between London and other European countries?

A.   That is correct.

Q.   Why don't you use your US passport for that?

A.   The British Government has a very similar rule such as the US Government has, and when you're traveling on official government business you need to use their own official

50

government passport.

Q.     **And why was it that you didn't think to bring that**

       **passport with you today?**

A.     **Because unless I'm on official government business for**

       **that country I cannot bring it with me.**

Q.     So we've established that you traveled from the US to

       Geneva on November 4th, returning on Sunday, November

       7th, correct?

A.     Correct.

**See docket no. 144, at page 15, Lines 19 - 25; page 16, Lines 1 -**

**11.**

Q.     So you arrived back in the States on November 2nd - -

A.     Correct.

Q.     - - or you left the States on November 2nd?

A.     I arrived back in the States for a two-day job here and then

       left again.

Q.     **And where were you before November 2nd?**

A.     **In London.**

Q.     **I don't see a stamp in here for your entry on November**

       **2nd.**

A.     **And you won't because it's not in that passport.**

Q.     **What passport did you use to gain entry back in the**

51

United States?

A.      Because I was on official business for British Telecom I used their government passport.

Q.      Okay. So your testimony is that the Homeland Security let - - gave you authorization to come back into the US on your British passport?

A.      Absolutely.

Q.      So let me ask you this question, if there are - - for every date now that I'm going to ask you about in July and August of 2010 - -

A.      Uh-huh.

Q.      - - if there's no date in the passport in my hand that reflects entry or exit from the US on those dates, is your testimony going to be that's because it's in your British passport?

A.      Yes, it is.

Q.      Ms. Mellott, the Court's ordered you today to bring with you the passport reflecting your travels on very specific dates in July and August.  Do you have that passport with you today?

A.      No, and I cannot bring it here without being on official government business from Britain.

52

**See docket no. 144, at page 16, Lines 22 - 25; page 17, Lines 1 - 25; page 18, Lines 1 - 5.**

Q.      So, let me just go through these dates so we can make a record on whether or not those dates appear in this passport or not.  July 6th, 2010, where were you?

A.      I was in London.

Q.      You were not in Germany?

A.      No.

Q.      July 16th, 2010, where were you?

A.      I was in Germany.

Q.      Where in Germany?

A.      Specifically, Frankfurt.

**See docket no. 144, at page 18, Lines 22 - 25; page 19, Lines 1 - 6.**

Q.      Where were you on July 21st, 2010?

A.      I was still in Germany.

Q.      Were you in Germany during that entire period from the 16th to the 21st?

A.      Yes, I was.

Q.      Doing the same business?

A.      Yes, I was.

Q.      And where were you staying between July 16th and the 21st

53

in Germany?

A.     Multiple places.  Either on base at Ramstein or a hotel next
       to my client.

Q.     How about August 8 of 2010?

A.     Germany.

Q.     Where in Germany?

A.     Same place.

**See docket no. 144, at page 21, Lines 1 - 11 and 20 - 23.**

Q.     August 9th?

A.     Germany.

Q.     How about August 16th?

A.     I believe I was on my way back to London to come back
       home for a couple of days.

Q.     So you were not in Germany on those day - - on that date?

A.     On that one date, no.

Q.     **Now, I have looked at all the dates in your passport that
       I have before me and there are no dates here that
       correspond with any of those dates in July and August
       that I just asked you questions about.  That's because
       those dates we would find in this British passport that
       you have?**

A.     **That is correct.**

54

**See docket no. 144, at page 22, Lines 1 - 2 and 11 -  23.**

Q.    So, your testimony is that you came back into the US for

each one of those trips on your British passport; is that right?

A.    In July and August?

Q.    Yes.

A.    I didn't say I came back to the United States in July and

August.

Q.    You spent the entire month of July and August in - - outside

of the US?

A.    The majority of it, yes.  I was here for 4th of July and then

after that I was not here.

Q.    **I don't see any entries in here in July of 2010 in the**

**passport in my hand, so that would be in your British**

**passport?**

A.    Most likely, yes.  I don't have it with me, so I don't know.

Q.    So, you were away from your six children in Europe for two

months, July and August?

A.    No, they visited me often.

Q.    **Your children were in Europe?**

A.    **Yes.**

Q.    **Your husband testified before this Court that your**

**children never left the country in July or August or**

55

**September or October of 2010.  Is it your testimony**

**today that your husband lied?**

A.      **Ms. Walker, I don't know what my husband testified to.**

**If you're telling me that's his testimony, then yes, that is**

**what I am saying.**

Q.      **I'm telling you that's what his testimony is.**

A.      **Okay.  Then my answer stands.**

Q.      **Why would your husband lie about your children being**

**in Europe?**

A.       **I can't answer that question for him.**

**See docket no. 144, page 23, Lines 11- 25; page 24, Lines 1 -**

**18.**

Q.      Now, your husband has not been formally reassigned by the

Air Force to Germany; isn't that correct?

A.      Um, I don't know that status actually.

Q.      Do you have any knowledge that the Air Force has given

your husband orders to reassign to Germany as you sit here

today?

A.      No, I do not.

Q.      And, in fact, your husband testified two weeks ago he has

not received any present orders for reassignment to

Germany in 2010.

56

A.      Okay.  That's news to me.

Q.      Then why would you put in this affidavit that you moved due

        to your husband's reassignment if you have no present

        knowledge that he's actually been reassigned?

A.      Because at the time of this affidavit it was my understanding

        he was.

Q.      So, he [husband] told you he was being reassigned, but he

        did not tell you that he actually had orders in hand, correct?

A.      No.  I don't believe he used those words.

**See docket no. 144, at page 27, Lines 12 - 25; page 28, Lines 1 -**

**2 and 13 - 16.**

Q.      Did the children physically move there?

A.      Yes, they've been there.

Q.      What period of time in July, August and September were

        your children living in Germany?

A.      The same times I were.

Q.      Give me specific dates.

A.      Um, every - - ever since we left after July 4th.

Q.      They were continuously - -

A.      And the rest of the month.

**See docket no. 144, at page 29, Lines 16 - 24.**

Q.      And you submitted a declaration to the Court stating that you

       couldn't be at that hearing because you were presently in

       London, correct?

A.     That is correct.

Q.     And is that your testimony today that you were in London - -

A.     Yes, I was.

Q.     **- - On that date?  You were in London on October 27th?**

A.     **Yes.**

Q.     And how long had you been in London on that particular

       trip?

A.     For three weeks.

Q.     Straight?

A.     Yep.

Q.     Are you aware your husband testified that you were in

       Colorado on the morning of the hearing and that he spoke to

       you about the hearing that day?

A.     Again, I don't know his testimony.  I spoke to him that day

       because we talked to each other over webcam, but I did not

       speak to him person-to-person, no.

Q.     So if he testified he saw you that morning at home, he would

       be lying?

A.     I would ask him to define home and how he saw me.

Q.     If he said that he saw you at your house in - -

58

A.    My house is in London.

Q.    - - Douglas County - - okay.  If he saw - - if he testified, ma'am, that he saw you face-to-face in Douglas County, Colorado that morning, your testimony is that he was lying?

A.    I would say he has his facts wrong, yes.

Q.    Where were your children that day?

A.    They were mostly with me.  There was one that was with him.

Q.    Which one was that?

A.    The oldest one.

. . .

Q.    Your oldest child was the only one that was present in Colorado on October 27th?

A.    Yes.

Q.    So if your husband testified that he saw Steel that morning in Colorado, gave her a kiss goodbye, your testimony is he'd be lying?

A.    He talked to her over webcam with me, yes, he did.

**See docket no. 144, at page 31, Lines 23 - 25; page 32, Lines 1 - 25; page 33, Lines 1-8 and 19 - 25.**

Q.    Have you ever been to the offices of Dish Network in Englewood, Colorado, ma'am?

A.    Of course, I have.

Q.    Have you been there any time in the last three weeks?

59

A.     Three weeks as of today, no.

Q.     So if a witness came into the court two weeks ago and testified

       he saw you at the offices of Dish Network on October 25th, that

       would be incorrect?

A.     Well, I spent my birthday not here, so I would have to say that

       would be incorrect.

Q.     That's your birthday, October 25th?

A.     The 24th.

Q.     So if he came in and said he saw you at Dish Network on

       October 25th, that would be incorrect?

A.     I would have to dispute that, yes.

**See docket no. 144, at page 35, Lines 17 - 25; page 36, Lines 1 - 7.**

Q.     So is your testimony now that on July 7th you were both in

       Germany --

A.     I was actually in several --

Q.     - -and London?

A.     - -several states.

Q.     I'm sorry, ma'am.  You need to let me finish my - - my question.

A.     My apologies.  Go ahead.

Q.     Is your testimony now that on July 7th you were in both

       Germany and London?

A.     In addition to two other countries, yes, on my way.

Q.     What two other countries?

60

A.    Switzerland and France.

Q.    Why when I asked you earlier if you were in Germany on July 7th you said no, you were in London?

A.    Because that was my final stop.  I recall you asking for my destinations not my routes.  I apologize.

**See docket no. 144, at page 57, Lines 12 - 25; page 58, Lines 1 - 3.**


**EXAMINATION BY MAGISTRATE JUDGE WATANABE**

**PURSUANT TO FEDERAL RULE OF EVIDENCE 614 OF MELISSA MELLOTT**

Q.    Ms. Mellott, is that the passport that you have from the United States?

A.    Yes, sir, it is.

Q.    And is that your signature that appears on it?

A.    Yes, sir, it is.

**See docket no. 144, at page 66, Lines 17 - 22.**

Q.    Is that your signature on docket - - or excuse me, exhibit D on page Qwest, underscore, 0013?

A.    Correct.

Q.    Okay.  So you signed that document, right?

A.    I did. And then - -

Q.    Well, no.  You signed that document right?

61

A.     Oh, sure.  Yes, I did.

Q.     Look at Exhibit C, please.

A.     Okay.

Q.     And go to the last page, page - - page - - well, if you go to the
       bottom middle page it's page 17, if you go to the CM-ECF
       stamp it says page 18 at the top right.

A.     Okay.

Q.     Which is your signature block, right?  You see that?

A.     I do see that.

Q.     Is that your signature on Exhibit C?

A.     Again, Your Honor, I apologize, the M's look like mine.

Q.     No. No. Ma'am, answer the Court's - - yes or no, is that your
       signature?

A.     It looks familiar.

Q.     So it's not your signature?

A.     It - - um, I can't say whether it is or not.  I mean, I've - - I
       usually have a slant. I mean, you can see that, right?  And so- -

Q.     Ma'am, everybody knows their own signature.

A.     Oh, I know.  And I mean - -

Q.     Okay.  So you just need to answer my question.  All right?  Did
       you sign Exhibit C on page 17 on the middle bottom which is
       under the ECF number at the top of page 18 where is says,
       Executed this 29th day of July 2010, Melissa Mellott, and

there's a signature there.  Do you see that?

A.    I do.

Q.    Is that your signature?  It's either a yes or no, ma'am.

A.    **It doesn't look like my signature, but I do remember signing a document like this one.**

Q.    So is your answer no?

A.    **Um, it does not look like my signature**.

Q.    Okay.  I need you to go back to Exhibit A.

A.    Okay.

Q.    And to go to sub-tab 118-1.  And go to the last page of that affidavit - -declaration, which is page 3 where it says, Executed this 22nd day of October, 2010.  Is that your signature?

A.    **It does not look like my signature, no.**

Q.    That's not my question, ma'am.  Is that your signature?

A.    **I would say no.**

Q.    Okay.  Wouldn't you agree, if you look at your passport and you look at Exhibit 118-1, in the signature block there and the signature on Exhibit C on page 17, at the bottom middle of page 18 if we look at ECM stamp - -

A.    Okay.  I 'm sorry, hold on.  I'm catching up to you.

Q.    Just set them out there.

A.    Okay.

63

Q.    Those don't look the same, do they?

A.    No, they don't.

Q.    You know your own signature, don't you?

A.    I do.

Q.    So I'm going to ask these questions again.  Did you sign Exhibit

C?

A.    Um, page 17, 18 of 18?

Q.    Yeah.

A.    **That does not look like my signature, no.**

Q.    Okay. And Exhibit A, sub-Exhibit 118-1, did you sign that

exhibit?  Yes or no, ma'am?

A.    Is that the page 3?

Q.    Did you sign - -

A.    **- - No.**

Q.    this or not?

A.    **No.  No.**

**See docket no. 144, at page 67, Lines 5 - 25; page 68, Lines 1 -**

**25; page 69, Lines 1 - 25; page 70, Lines 1 - 14; page 71, Lines**

**6 - 9.**

Q.    All  your children have passports, right?

A.    Yes, they do.

Q.    So you can produce those tomorrow to the Court.

64

A.     Um, I don't have them with me here.

Q.     You have to have them with you if you're here in the United
       States, don't you, ma'am?

A.     Um, well, they're US passports.

Q.     Right.

A.     I'll have to try to contact Jason to see if he has them.  I don't
       have them because he was supposed to be traveling with
       them next.

Q.      I'm talking about continuing this hearing tomorrow so I can
       have these passports show up here.

A.     I need to make sure that he has them because I don't have
       them.  When I came - - when I got back here - -

**See docket no. 144, at page 75, Lines 14 - 25; page 76, Lines 1 -
2 and 19 - 24.**

Q.     Okay.  Who has possession [of the passports] of the two
       children that came with you that came with you on Sunday?

A.     They're all together. [meaning all six of the children
       passports].

Q.     Oh, so you have  - - he [Jason Mellott]  has all of the
       passports?

A.     Right now.  Right now, yeah.

**See docket no. 144, at page 77, Lines 6 - 10.**

65

Q.      Okay.  And where is your British passport?

A.      It is in Britain.

Q.      Where?

A.      Um, probably sitting on my desk.

Q.      At your office?

A.      Correct.

Q.      And where is your office located?

A.      It is in Britain in British Telecom.

Q.      So somebody there could ship that to the Court, right?

A.      Um, yeah, but because it is a government passport, and
        that's what I was trying to explain, is that if I would have
        brought it with me and not had a job order that says I'm
        traveling on official government business, they would have
        confiscated it upon my exit.

Q.      Who would have confiscated it?

A.      The country.

**See docket no. 144, at page 78, Lines 15-25; page 79, Lines 1-9.**

Q.      Because I am going to order you to bring your passport to
        court, your British passport.  You can use your American
        passport to get from here to wherever you need to get, or
        you can get somebody to ship that out here.

A.      My American passport is tied to my Visa there though.  So
        they know if I'm not using it to leave the country then - -

66

Q.    All right.

A.    I'm - - we can try it, I guess.

**See docket no. 144, at page 80, Lines 9 - 19.**

Q.    And you're going to need to bring your passports for all of

      your children with you that are valid.

**See docket no. 144, at page 81, Lines 14 - 16.**

Q.    The record reflects you didn't show up on October 27th, 2010

      when you were supposed to be here.

**See docket no. 144, at page 82, Lines 5 - 7.**


**EXAMINATION BY DEFENDANT'S ATTORNEY, MS. WALKER,**

**BASED UPON THE COURT'S QUESTIONS OF MELISSA**

**MELLOTT**

Q.    Your British visa, that's not in your US passport, though, is

      it?

A.    No, it's not.

Q.    There's no stamp of your visa in their passport?

A.    No.

Q.    That's because it's in your British passport?

**A.    It's with the rest of my paperwork, yes.**

**See docket no. 144, at page 84, Lines 16 - 22.**

67

**EXAMINATION BY PLAINTIFF'S ATTORNEY, MR. OLSEN,**

**BASED UPON THE COURT'S QUESTIONS OF MELISSA**

**MELLOTT**

Q.     **But you're not saying you didn't sign those?**

A.     **Um, those don't look like my signatures, but I did sign**

        **those documents.  I'm not saying that that's my**

        **signature, though.  I can't - -**

Q.     **So you're saying you signed these documents but not**

        **the versions that are sitting in front of you now?**

A.     **Correct.**

Q.     **Is there anyone else who was at your end of**

        **communications with our office who might have been**

        **intercepting them and doing - - and doing this work for**

        **you?**

A.     **There shouldn't have been, no.**

Q.     **Or signing for you?**

A.     **Not that I'm aware of.**

Q.     **Or correcting these dep - - these declarations and**

        **changing them?**

A.     **No, not that I'm aware of.**

Q.     **To make them fully accurate and truthful?**

A.     **Just me.**

68

**See docket no. 144, at page 91, Lines 8 - 25; page 92, Line 1.**

**RECORD MADE BY MAGISTRATE JUDGE WATANABE**

**The Court:** Ms. Mellott, you may step down.  The Court has issued

a sequestration order.  You are not to discuss your testimony with

any other witness.  Leave all of the documents there, including your

passport, please.  Thank you.

Before I try to make an effort to call Mr. Mellott it's my

understanding, Ms. Walker, you have no witnesses to call, correct?

**Ms. Walker:** That's correct, Your Honor.

**The Court:** All right.  So you're resting, correct?

**Ms. Walker**: Yes.

**The Court:** Mr. Olsen, do you have any witnesses to call?

**Mr. Olsen:** No, Your Honor.  Thank you.

**The Court:** All right.

**See docket no. 144, at page 87, Lines 20 - 25; page 88, Lines 1 -
10.**

**The Court:** . . . I will order Ms. Mellott to provide to the Court the

United States passports for her children that she's

used as recently as last week and - - meaning,

November 2nd, 2010, as well as November 7th, 2010,

for the six children since two of them were used on

69

the 7th and two - - four were used on the 2nd.  So bring

those passports with you tomorrow. . . .

**The Court:**   . . .  So, Ms. Mellott, tomorrow you need to bring with

you your children's - - all six of them, their passports

that you used last week on November 2nd and on

November 7th of this week. . . .

**See docket no. 144, at page 89, Lines 5 - 11 and 16 - 19.**

29.    That on day two of the hearing on Defendant's Motion for Court

Order to Plaintiff to Surrender Passport and for Expedited Ruling

(docket no. 126), the Plaintiff Melissa Mellott did not produce the

United States Passports for her six children as ordered by this court

on November 9, 2010.  Accordingly, Magistrate Judge entered the

following Order:

**It is ORDERED:**

1.    That this hearing is continued to **Tuesday, November 16,
2010, at 1:30 p.m.**

2.    Defendant's MOTION FOR COURT ORDER TO
PLAINTIFF TO SURRENDER PASSPORT, AND FOR
EXPEDITED RULING [Docket No. 126, Filed October
28, 2010, is **TAKEN UNDER ADVISEMENT**.

3.    Both counsel are ordered to subpoena Mr. Jason Mellott,
and serve a subpoena duces tecum to Mr. Jason Mellott to
produce the passports of the six children requested by the
Court for the hearing on **November 16, 2010, at 1:30 p.m.**

4.    The Court orders all parties and counsel that are present
at today's hearing, shall appear for the hearing on
**November 16, 2010, at 1:30 p.m.**  Failure to appear by
any of the parties, including counsel at the hearing
will result in a warrant for your arrest.

70

5.    That by **12:00 noon on Monday, November 15, 2010**, counsel for the parties shall provide the Court with their legal briefs concerning the issue regarding any law which suggests under British Law or United States Law that prohibits a United States citizen that is working in England and working for the British government, who has been issued a British passport and a British work visa any law that prohibits that person from bringing their British passport and British work visa to the United States District Court for review, in practically noting that the person suggesting that is a United States citizen.

6.    The Court advises all parties and counsel that they are still ordered to appear in front of Judge Brimmer on **December 21, 2010, at 8:30 a.m.  A SHOW CAUSE HEARING is scheduled for DECEMBER 21, 2010 at 10:30 a.m.** or before if the hearing with Judge Brimmer is concluded before 10:30 a.m., in Courtroom A-502, Fifth floor, Alfred A. Arraj United States Courthouse, 901 19th Street,  Denver, Colorado 80294.

7.    That the plaintiff, Ms. Melissa Mellott is **ORDERED** to produce the passports for her six children at the hearing on November 16, 2010, at 1:30 p.m.

8.    That the original passport and the copy of Ms. Melissa Mellott shall be sealed and not opened until further ordered by the Court.

Hearing continue[d].

(Docket no. 147);

30.    That at the November 16, 2010, continued hearing on the Defendant MSN Communications, Inc.'s Motion for Court Order to Plaintiff To Surrender Passport and for Expedited Ruling (docket no. 126), the Plaintiff Melissa Mellott again **failed to appear**. Magistrate Judge Watanabe issued a second Show Cause Order to Plaintiff Melissa Mellott for her failure to appear and set such Show

71

Cause Hearing for December 21, 2010, at 10:30 a.m. (docket no. 150);

31. That at the November 16, 2010, continued hearing, Plaintiff Melissa Mellott's husband, Jason Mellott, appeared per a subpoena *duces tecum*. Mr. Mellott had previously testified before Magistrate Judge Watanabe on October 27, 2010. Mr. Mellott did not bring with him the current six (6) United States Passports for his six (6) children that he testified about on October 27, 2010, and that Plaintiff Melissa Mellott testified to on November 9, 2010, per the subpoena *duces tecum.* Mr. Mellott wanted to inform the court of his position, and this court allowed him to make a record. Mr. Mellott informed this court that he had the six (6) United States Passports for his six (6) children in his safe in his home, but when he went to look for them, they were gone, and only his Passport was in the safe. Magistrate Judge Watanabe asked Mr. Mellott who had access to the safe, and he said his wife (Plaintiff Melissa Mellott) and himself. Magistrate Judge Watanabe orally ordered that Jason Mellott appear at the hearing before Judge Brimmer on December 21, 2010, at 8:30 a.m. and that he also appear at the hearing before Magistrate Judge Watanabe on December 21, 2010, at 10:30 a.m. Magistrate Judge Watanabe also informed Jason Mellott that the Order for Sequestration of Witnesses that Magistrate Judge Watanabe entered at the October 27, 2010, is still in effect, and Mr.

72

Mellott was to follow that order.  Mr. Mellott acknowledged that he needed to be present at the December 21, 2010, hearings before both Judges Brimmer and Watanabe and that he understood the Order for Sequestration of Witnesses was still in effect; and

32.     That the Plaintiff's United States Passport shows only the following travel out of and back into the United States during 2010: February 4 and 9, 2010 - out of the United States to Tahiti and back to the United States; March 6 and 7, 2010 - out of the United States to Frankfurt and back to the United States; April 22 and 30, 2010 - out of the United States to Australia and back to the United States; September 11 and 12, 2010 - out of the United States to Amsterdam and back to the United States; and November 5 and 7, 2010 - out of the United States to Geneva and back to the United States.  Such Passport entries do not support Plaintiff's testimony concerning her travels back and forth to Europe and her living in Germany and London.

## CONCLUSIONS OF LAW

That an order to surrender a passport is "very rare" in civil cases outside the matrimonial context.  Merrill Lynch Bus. Fin. Servs., Inc. v. Kupperman, No. 06-4802, 2007 WL 2300737, at * 1 (D.N.J. Aug. 7, 2007).  Such an order is appropriate where defendant "has ' demonstrated a propensity to leave the country when the heat is turned up.'"  Id. at *2 (quoting Herbstein v. Bruetman, 241 F.3d. 586, 588 (7th Cir. 2001)).

Based upon these above finding of fact, I conclude:

73

1.    That Plaintiff **failed to appear** before Magistrate Judge Watanabe on October 27, 2010, for hearing on Defendant MSN Communications Inc.'s Motion for Attorney Fees and Costs (docket no. 85) even though she was ordered to appear, in person, by Magistrate Judge Watanabe.  See minute order (docket no. 106). In addition, Plaintiff failed to present her United States Passport the she used on July 7, 16, 21 and August 8, 9, and 16, 2010, while she was in Germany at this hearing as ordered by Magistrate Judge Watanabe.  See minute order (docket no. 106).  That as a result of Plaintiff's failure to appear, Magistrate Judge Watanabe issued a written Order to Show Cause to Plaintiff and set such Show Cause Hearing on December 21, 2010, at 10:30 a.m.  See docket no. 131.  That Plaintiff was physically present in the state of Colorado and not in Europe on October 25, 26, and 27, 2010, based upon the testimony of Plaintiff's husband, Jason Mellott, and based upon the testimony of a former co-worker of Plaintiff, Clifton Wiser.  See specific portions of the testimony of Jason Mellott and Clifton Wiser cited above in this opinion.

2.    That District Judge Brimmer granted Plaintiff's Motion to Dismiss with Prejudice (docket no. 121) on October 29, 2010.  However, Judge Brimmer did not enter judgment but instead reserved entering judgment until the collateral issues that are pending are resolved.  District Judge Brimmer also informed the Plaintiff in this order (docket no. 130): **". . . Plaintiff is reminded that she has been ordered to attend the**

74

**December 21, 2010 hearing."**  See docket no. 130.

3.    That with regard to Plaintiff's Declaration (docket no. 98-1), paragraph 4 is untrue and false.

4.    That with regard to Plaintiff's Motion to Reset the October 27, 2010 Hearing before the Magistrate Judge to December 21, 2010 (docket no. 118), paragraphs 2, 3 - second sentence, 6, 8 - second sentence, 9, and 12 and paragraphs 3, 7, 7 [sic] 8, 9, 12, and 14 of the Plaintiff's Declaration (docket no. 118-1) are all untrue and false.

5.    That with regard to Plaintiff's Motion for Reconsideration of the Magistrate Judge's Order Denying Her Motion to Reset the October 27, 2010 Hearing (docket no. 122), paragraph 5 is untrue and false.

6.    That as to Plaintiff's testimony on November 9, 2010, that she lives at Hamilton House, Mabledon Place in London, England, such testimony is untrue and false.  The Hamilton House is a business office-type building and not a residential building.

7.    That as to Plaintiff's testimony on November 9, 2010, that she has moved all six of her children to either London, England, or Germany, the weight of the evidence has demonstrated that this testimony is untrue and false.

8.    That as to Plaintiff's testimony on November 9, 2010, that she was not in Colorado on October 27, 2010, the weight of the evidence has demonstrated that this testimony is untrue and false.

9.    That Plaintiff's testimony on November 9, 2010, that she has **both** a valid

75

United States Passport and a valid British Passport **currently** is untrue and false. Plaintiff is a United States citizen, and there is no evidence that Plaintiff has dual citizenship with Britain. Plaintiff is not a British citizen. Plaintiff has not produced to this court for inspection her purported "British Passport" or her purported "British Work Visa" even though she testified she was issued by the British government both a British Passport and a British Work Visa. Moreover, the law that defendant submitted to the court strongly suggests that you have to be a British citizen in order to be eligible for a British passport. See docket no. 146.[2]

10. That the current whereabouts of the Plaintiff is unknown following Plaintiff's **second failure to appear** on November 16, 2010, before Magistrate Judge Watanabe. The court does not know where Plaintiff is, Plaintiff's counsel Jack Olsen does not know where Plaintiff is, and Plaintiff's own husband, Jason Mellott, does not know where Plaintiff is. The statements to the court by Jason Mellott, who had to be subpoenaed, at the November 16, 2010 hearing, strongly suggest that the Plaintiff took the six passports of her six children out of the safe at Jason's Mellott's

---

[2]Plaintiff's brief (Docket No. 148) did not address the issue the court directed the parties to brief. (See docket no. 147, Courtroom Minutes/Minute Order, directing "legal briefs concerning the issue regarding any law which suggests under British Law or United States Law that prohibits a United States citizen that is working in England and working for the British government, who has been issued a British passport and a British work visa any law that prohibits that person from bringing their British passport and British work visa to the United States District Court for review, in [particularly] noting that the person suggesting that is a United States citizen.") Instead, plaintiff's brief concerned "Identity Cards" used for travel within the nations of the European Union.

home since the only people who had access to such safe was Jason

Mellott and Plaintiff.  Mr. Mellott told Magistrate Judge Watanabe that he

was unable to produce the passports for the six children per the subpoena

*duces tecum* served upon him to the court because when he looked for

the passports in his safe, they were all gone, and only his own personal

passport was left in the safe.  The evidence also shows that Plaintiff has

traveled to Europe in the past, although her United States passport does

not support her travel in Europe during the pertinent  time frames of July 7,

16, 21, 2010, August 8, 9, and 16, 2010, and October 27, 2010; that

Plaintiff has not produced her purported  "British Passport" to support her

contention that she was in Europe during the above time frames even

though the Plaintiff testified that her British Passport will show that she did,

in fact, travel in Europe during the above time frames; that Plaintiff further

has not produced the United States Passports of her six children to

support her testimony that the children were with her in Europe even

though she was court ordered by Magistrate Judge to produce the same;

that Plaintiff may have used Sandra Prince's Social Security number in the

past (See sealed docket nos. 109-1; 109-3, Affidavit of Sandra Prince);

that Plaintiff has worked in the United States following her termination with

Defendant, and Plaintiff's testimony about working and living in Europe

with her six children and home schooling her six children is not credible,

noting that Plaintiff has been employed in the United States by

Blackstone, Qwest, Spanlink Communications, and was seen working by

Clifton Wiser at Dish Network in Englewood, Colorado, as recently as October 25, 2010, and in fact, Mr. Wiser even took a photo of Plaintiff working on that day (see photo of Plaintiff working at Dish Network on October 25, 2010 (Def.'s Ex. M, Oct. 27, 2010, hearing)); that Plaintiff is a flight risk; and, that if anyone has created a protracted and unnecessary **"sideshow,"** it is the Plaintiff and Plaintiff's counsel and not Magistrate Judge Watanabe or District Judge Brimmer.  See entire record of all court proceedings.

11.    That Plaintiff has demonstrated, through her own actions, that she has the propensity to fail to appear when the heat is turned up.  Plaintiff has further demonstrated an "enduring refusal to cooperate" by failing to appear for court hearings as ordered; by failing to produce her purposed British Passport that could have easily verified her alleged travel in Europe during the pertinent time frames listed above; by failing to provide this court with the United States Passports of her six children so that the court could verify the travel of these children in Europe as testified to by Plaintiff; by failing to provide to this court Plaintiff's purported Work Visa issued by the British government; and by failing to comply with multiple court orders. Instead, Plaintiff has absconded, and this court, Plaintiff's counsel Jack Olsen, and Plaintiff's husband, Jason Mellott, do not know her whereabouts.  Plaintiff's actions are an abuse of process, noting that it is Plaintiff who filed this lawsuit, and Defendant MSN Communications, Inc.'s Motion for Court Order to Plaintiff to Surrender Passport and for Expedited

78

Ruling (docket no. 126) should be granted.


**ORDER**


**WHEREFORE**, based upon these findings of fact and conclusions of law, this court **ORDERS:**

1.     That Defendant MSN Communications, Inc.'s Motion for Court Order to Plaintiff to Surrender Passport and for Expedited Ruling (docket no. 126) is **GRANTED;** and

2.     That Plaintiff Melissa Mellott's United States Passport, which Plaintiff provided to the court on November 9, 2010, shall be placed into the registry of this court, and such passport shall not be returned to Plaintiff until further Order of Court.

Done this 8th day of December, 2010.

BY THE COURT

s/ Michael J. Watanabe
MICHAEL J. WATANABE
U.S. MAGISTRATE JUDGE