IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Case No. 09-cv-02418-PAB-MJW

MELISSA MELLOTT,

      Plaintiff,

v.

MSN COMMUNICATIONS, INC.,

      Defendant.

---

## ORDER

---

      Every now and then a case comes along that is truly remarkable, but for all the wrong reasons.  This is such a case.

      The matters before the Court are defendant's motion for attorney's fees and costs [Docket No. 160] and motion to compel disclosure of attorney client communications pursuant to the crime/fraud exception [Docket No. 140], as well as plaintiff's motion for sanctions against defendant [Docket No. 248].  The Court held a hearing on defendant's motions on December 21 and December 27, 2010.

      This is a gender discrimination case wherein defendant alleges that, during discovery, plaintiff lied about the factual basis of her claims, falsified documents, and otherwise perpetrated frauds on the Court.  Moreover, defendant alleges that plaintiff's counsel crossed the line from loyalty to his client to facilitating her misconduct.  Defendant seeks sanctions under 28 U.S.C. § 1927, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, Federal Rules of Civil Procedure 11, 26, and 37, and the Court's inherent supervisory power.

## I. BACKGROUND

Counsel John R. Olsen filed the present action on behalf of plaintiff Melissa Mellott on October 13, 2009.  *See* Docket No. 1.  Plaintiff, who had been employed by defendant, brought four claims for relief: (1) gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, *see* Docket No. 1 at 6; (2) gender discrimination and retaliation in violation of Colorado state law, *see id.*; (3) breach of contract and wrongful termination, *see id.*; and (4) promissory estoppel, *see id.*  Plaintiff sought damages which included "back pay, equal pay, front pay and benefits," "liquidated and compensatory damages, including for future pecuniary losses, medical injury and harm, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life," and "exemplary or punitive damages." Docket No. 1 at 7.  Defendant filed its answer to the complaint on November 2, 2009. *See* Docket No. 4.

In support of her claimed damages, plaintiff represented, through declarations, testimony, and pleadings signed by her as well as with the assistance of counsel, that she was not employed for compensation after being terminated by defendant in January 2009.  After the filing of plaintiff's lawsuit, defendant discovered evidence that plaintiff accepted a higher paying job with Blackstone Technology Group ("Blackstone") in January 2009, the same month as her termination from defendant, which was followed by her acceptance of a position with Qwest Communications ("Qwest") in the summer of 2009.  On January 6, 2010, defendant supplied documentation to plaintiff's counsel regarding plaintiff's employment with Qwest.  *See* Def.'s Ex. A30.  One week later, plaintiff responded to a Fed. R. Civ. P. 36 request for admission by denying that

she had "been employed in any capacity" since January 16, 2009.  Docket No. 82-18 at

4.

On February 1, 2010, defendant supplied plaintiff's counsel with documents

evidencing plaintiff's employment with Blackstone.  *See* Def.'s Ex. A32; *see also* Def.'s

Ex. A33 (producing additional documentation of plaintiff's employment with Qwest to

plaintiff's counsel on February 9, 2010).  On March 16, 2010, however, plaintiff

responded to a Fed. R. Civ. P. 33 interrogatory by contending that she had "not been

employed for compensation."  Docket No. 82-21 at 5.[1]

Defendant deposed plaintiff on April 16, 2010.  During her deposition, plaintiff

initially testified that she never did any work for Blackstone.  *See* Def.'s Ex. A56 at

11:54:31.  Later in the deposition she stated that she had done work for Blackstone

"consulting with a client trying to get a sale."  *See id.* at 4:16:18.  Plaintiff testified that

she worked only 27 hours for Blackstone between late January and June 2009, *see id.*

at 4:16:35, and was paid "about $1,000" for her work.  *See id.* at 4:17:01.  When

defendant presented her with Blackstone payroll records with plaintiff's signature on

each page that contradicted her testimony, plaintiff stated that the records represented

time she spent in a "holding pattern," *id.* at 4:19:42, and that she was never paid for that

time.  *Id.* at 4:21:10.  Defendant then presented plaintiff with a W-2 produced by

Blackstone reflecting payment of over $51,000 to plaintiff in 2009.  Plaintiff denied

receiving the W-2 or the income reflected in it.  *See id.* at 4:22:16, 4:22:26.

Furthermore, she denied having done a substantial amount of work for Qwest.  *See id.*

_____

[1]On July 29, 2010, plaintiff reiterated that, as of March 16, 2010, she "had not
gotten a regular job again."  Docket No. 82-23 (M. Mellott Decl.) at 15, ¶ 75.

at 4:38:20.  Plaintiff stated that she was paid about $12,000 by Qwest, *see id.* at

4:39:25, and that the W-2 to the contrary issued by Qwest was incorrect.  *See id.* at

4:40:18.  Plaintiff testified that the W-2 showed the amount of the total contract Qwest

had with a client – over $68,000, *see id.* at 4:43:49 – not what plaintiff was actually

paid.  *See id.* at 4:41:13.

During her deposition, defendant also questioned plaintiff about her use of a

Social Security Number ("SSN"), 262-xx-xxx, on a U.S. Citizenship and Immigration

Services I-9 Employee Eligibility Form, as that number was different from the 419-xx-

xxxx SSN that defendant knew her to claim.  Plaintiff explained that the 262 number

was an "ITN" number and an "employer identification number."  Def.'s Ex. A56 at

11:54:56.  She stated that, in light the nature of her husband's employment, much of

their information is "masked" and, therefore, they are assigned what she then referred

to as a "federal locator number."  *Id.* at 11:55:00.  When defendant asked her why she

put down her "federal locator number" on employment forms instead of her SSN,

plaintiff testified that she was "instructed to" by the federal government "for protection of

their resource."  *Id.* at 11:55:28.  Plaintiff stated that when the "federal locator number"

is entered into a database, it is connected with her real SSN, but only if the entity

entering the number has "the proper software to get past the security clearance."  *Id.* at

11:56:31.[2]  Plaintiff testified that, because of her husband's position with the U.S. Air

Force, her husband's commander handed her, and the rest of their family, a packet of

---

[2]As for her own security clearance, plaintiff stated that it was one step below
"Top Secret."  Def.'s Ex. A56 at 11:58:37.  She suggested that she was required to
receive such a clearance in order for her husband to renew his security clearance.  *See
id.* at 11:58:45.

materials including the "federal locator number."  *Id.* at 4:23:30.  Plaintiff was also asked

about whether she was familiar with a "Sandra Prince," whose SSN was the same as

the number plaintiff claimed was her "federal locator number."  Plaintiff claimed that

Blackstone should not have entered the "federal locator number" in the part of a form

designated for a SSN, which resulted in pulling up someone else's records.  *See* Def.'s

Ex. A56 at 4:30:23.

On April 20, 2010, defendant sent plaintiff's counsel a letter providing notice of

defendant's belief that the plaintiff's counsel had violated Federal Rules of Civil

Procedure 11 and 26(g) and demanding plaintiff withdraw her claims.  In particular,

defendant emphasized that plaintiff's counsel "represented in pleadings, responses to

motions and before the Court during the December 15, 2009 Scheduling Conference

that [plaintiff] has remained unemployed since the date of her termination."  Def.'s Ex.

A-41 at 1.  Defendant further noted plaintiff's deposition testimony regarding the

"federal locator number."  *Id.* at 3.  Finally, defendant stated its view that plaintiff had

manufactured evidence.  *Id.*

Plaintiff did not withdraw her claims.  Therefore, defendant filed a motion to

dismiss and motion to stay discovery on June 10, 2010.  *See* Docket No. 51, 52.[3]

Defendant moved to dismiss, "[p]ursuant to Federal Rules of Civil Procedure 11, 26, 37

---

[3]Defendant originally filed a motion for leave to file excess pages, a motion to dismiss, and a motion to stay on June 8, 2010.  *See* Docket Nos. 43, 44, 45.  The Court struck all three motions.  The motion for leave to file excess pages failed to comply with D.C.COLO.LCivR 7.1A and D.C.COLO.LCivR 10.1K.  *See* Docket No. 46.  The motion to dismiss was stricken for failure to comply with D.C.COLO.LCivR 10.1K and for failure to first receive leave to exceed the Court's page limitations.  *See* Docket No. 47.  Finally, the motion to stay failed to comply with D.C.COLO.LCivR 10.1K.  *See* Docket No. 48.

and 28 U.S.C. § 1927," on the grounds that plaintiff's claims were "groundless, frivolous and in violation of the applicable rules of civil procedure."  Docket No. 51 at 1.

On July 2, 2010, plaintiff filed a motion for extension until July 22, 2010 to respond to defendant's motion to dismiss and motion for stay.  *See* Docket No. 56.  In that motion, plaintiff's counsel averred that he needed additional time because, *inter alia*:

> • "[T]he defense has filed a 'shotgun array' of accusations against the plaintiff designed to destroy her professional and personal reputations in the public record.  Each prong of the attack must be met with a detailed briefing of the facts and law."

> • "[Defendant's] motion to dismiss also contains affidavits from two witnesses who are either endorsed as experts or who opine as experts.  Both attack plaintiff's honesty and integrity, and their opinions will have to be met with plaintiff's own experts, who are in the process of being retained."

> • "At the same time, the defense has filed a patently frivolous motion to stay discovery – with no basis in fact or law.  This, too, must be responded to with a detailed presentation of fact and law."

Docket No. 56 at 2.  In other words, plaintiff's counsel requested additional time to conduct his own investigation into the allegations and to refute them to the extent appropriate.  The Court granted plaintiff the extension.  *See* Docket No. 57.

On July 22, 2010, the day plaintiff's response was due, plaintiff's counsel filed a second motion for extension of time [Docket No. 61], seeking an extension until July 29, 2010 to respond to the motion to dismiss and the motion to stay discovery.  The Court struck the motion on July 23, 2010 [Docket No. 62] for failure to comply with § I.E.2 of this Court's Practice Standards, which provides that "[a]ny motion for extension of time shall be filed no later than three business days prior to the date the motion, response,

reply, or other paper is due."  The Court granted plaintiff's counsel leave to show cause by July 26, 2010 why he did not comply with § I.E.2.  After plaintiff responded, the Court granted plaintiff leave until July 29, 2010 to file a response to the motion to dismiss. *See* Docket No. 66.  Furthermore, the magistrate judge granted defendant's motion to stay discovery.  *See* Docket No. 70.

Instead of filing her response on July 29, 2010, plaintiff's counsel filed a motion to seal the response and a motion requesting until August 1, 2010 to file a response. *See* Docket Nos. 73, 76.  On August 2, 2010, the magistrate judge denied the motion to seal without prejudice, *see* Docket No. 80, and the Court denied the motion for extension of time as moot.  *See* Docket No. 81.  Instead of refiling the motion to seal, plaintiff filed an unsealed response on August 2, 2010 along with a fourth motion for extension of time to respond.  *See* Docket Nos. 82, 83.  The Court granted the motion for extension of time and accepted the response for filing effective August 2, 2010.  *See* Docket No. 84.  The Court made clear, however, that plaintiff had failed to show cause for her untimely response, but that it would consider the response "[i]n light of the seriousness of the arguments raised and the nature of the relief sought in defendant's motion."  *See id.*

Plaintiff's response to defendant's motion admitted to no error.  Rather, plaintiff's counsel characterized the motion to dismiss, and its allegations of fraud, as itself an act of fraud.  For example, plaintiff's counsel responded to the claim that his client was fraudulently using the "262" SSN at her new positions by submitting documents he contended established her entitlement to use the number.  He then affirmed his client's description of the 262 number as what was now referred to as a Temporary

7

Identification Number ("TIN") assigned to her by the Social Security Administration ("SSA") in light of her husband's position.  Mr. Olsen asserted that this TIN served in the place of plaintiff's SSN and was "assigned by the federal government . . . . for reasons that [plaintiff] cannot disclose."  Docket No. 82 at 9.  Instead of an independent investigation into the existence of TINs or "federal locator numbers," it is clear that Mr. Olsen was relying upon his client's version of events.  *See* Docket No. 82-23.

That version of events relied upon fabricated evidence.   Plaintiff submitted the 262 number on her employment application with Qwest Communications.  Upon checking that number, the Department of Homeland Security informed Qwest that plaintiff was not associated with that number.  Mr. Olsen submitted an email exchange between plaintiff and individuals at Qwest surrounding this issue.  *See* Docket No. 82-13.[4]  Plaintiff informed Qwest that the SSA told her that she would be assigned yet another temporary number which would permit Qwest to verify her employment eligibility for a 72-hour period.  Mr. Olsen noted, but apparently was untroubled by, the fact that this "new" temporary number is the same as plaintiff's 419 SSN, but simply hyphenated differently.  *See* Docket No. 82 at 11.  In other words, Mr. Olsen had figured out that his client had misled Qwest into thinking that, when it entered her SSN, it was entering a temporary number.  Once that temporary number resulted in the verification of her identity, plaintiff was then able to represent to Qwest that it should no longer use that number, but rather the 262 number.  Even after recognizing this aspect

---

[4]In response to the motion to dismiss, and despite overwhelming evidence to the contrary, plaintiff's counsel continued to assert, based solely upon his client's assertions, that plaintiff's statements regarding her employment at Qwest were accurate.  *See* Docket No. 82 at 12.

of his client's fraud, Mr. Olsen did not balk at continuing to support her version of events.  Such was the case even after he was notified at the December 27, 2010 motions hearing that the SSA document he submitted in support of plaintiff's claims misspells "temporary" three times, *see* Docket No. 244 at 65; *see also* Docket No. 82-14 (spelling it "temperary"), making it highly unlikely that it was a genuine SSA document.

Mr. Olsen attempted to refute defendant's contention that plaintiff altered emails.  The basis of his refutation was that plaintiff would not have been able to alter the emails in defendant's server.  *See* Docket No. 82 at 14-15.  Defendant, however, did not claim that she had done so.  Rather, defendant submitted evidence showing that the emails plaintiff produced to defendant as part of her initial disclosures were inconsistent with the emails on defendant's server.  Nothing plaintiff or her counsel have submitted undermines that evidence.  Nor did Mr. Olsen address the evidence that his client had altered other documents.  *See* Docket No. 51 at 15.  Mr. Olsen also supplied his own declaration in support of plaintiff's response, wherein he described his understanding of the nature of the security clearance issued to plaintiff's husband.  *See* Docket No. 82-10.  He offered no explanation of how he believed that security clearance leads the federal government to issue alternative and temporary numbers to family members in order to "mask" the identity of those family members.  In reply, defendant again recounts the overwhelming evidence demonstrating that plaintiff's various contentions were false and that she was fabricating evidence.  *See* Docket No. 113.

On August 9, 2010, while the motion to dismiss was still being briefed, defendant filed a motion for attorney's fees and costs for having to "respond to Plaintiff's failed

efforts to file her Opposition to Defendant's Motion to Dismiss and related materials under seal and at the last minute - which effort she later wholly abandoned." Docket No. 85 at 1. Plaintiff argued that the response should be sealed because it "discusses in detail plaintiff's social security number, her federal TIN number and her federal TMPSSN." Docket No. 73 at 1-2, ¶ 2. Plaintiff then requested a "forthwith" hearing on her motion to seal, contending that there was "a special urgency to this request, because plaintiff and her husband ha[d] been flown to Germany, where he ha[d] been assigned to another sensitive role in the military (and involving security of the United States)." Docket No. 77 at 2, ¶ 7. Defendant contends that, contrary to plaintiff's explanation, plaintiff had not relocated to Germany with her husband or been traveling to and from Germany in anticipation of such a move. In response, Mr. Olsen describes the allegations by defendant against him and his client as a tactic to avoid having defendant's employees deposed in this case. He also submitted a declaration by his client affirming that she was in Germany, attaching highly redacted bank records he contended supported that fact. *See* Docket No. 98-1. Mr. Olsen again submitted his own declaration. *See* Docket No. 98-2.

In reply, defendant provided evidence demonstrating that plaintiff's husband had not been relocated to Germany. Of particular note, Mr. Olsen was aware of the fact that plaintiff's husband had not been relocated prior to responding to defendant's motion. *See* Docket No. 104-1 at 2, ¶ 3. In fact, Mr. Olsen apparently contacted Major Richard A. Williams, a representative of the Air Force Academy where Mr. Mellott was then stationed, to request a declaration confirming Mr. Mellott's relocation. Upon receiving information to the contrary, Mr. Olsen persisted in contending, not only in his

10

role as plaintiff's counsel but as a witness on her behalf, that Mr. Mellott had been relocated. *See* Docket No. 98-2. Mr. Olsen also sent an abusive email to Major Williams. *See* Docket No. 104-2.

Plaintiff, through Mr. Olsen, sought to reschedule an October 27, 2010 hearing before the magistrate judge on December 21, 2010. *See* Docket No. 118. In her motion to reschedule, which was not filed until October 25, 2010, plaintiff contended that she could not afford the plane ticket from Germany back to Denver with her six children to attend the October 27 hearing. *See id.* at 1-2, ¶¶ 2, 3. Mr. Olsen also noted that plaintiff had offered to dismiss the case with prejudice. The sole reason cited for the offer to dismiss the case was plaintiff's inability to afford continued prosecution of the matter. *See id.* at 1-2, ¶ 2. Mr. Olsen further supplied a declaration by plaintiff contending that, after relocating to Germany, she thereafter moved to England to find work. *See id.* at 3, ¶ 12. He then described the defense motions as a "sideshow." *See id.* at 3, ¶ 13. On October 25, 2010, the magistrate judge denied plaintiff's motion to reschedule the hearing and repeated an order that plaintiff "bring her United States Passport with her to this hearing that she used on July 7, 16, 21 and August 8, 9, and 16, 2010." Docket No. 120; *see* Docket No. 106.

The following day plaintiff filed a motion to dismiss the case with prejudice [Docket No. 121].[5] The basis for the motion was her inability to pay for the flight back to Denver for the hearing. *See* Docket No. 121. Defendant objected to the motion to

---

[5]On October 26, 2010, plaintiff also filed a motion for reconsideration of the magistrate judge's denial of her motion to reschedule the October 27 hearing [Docket No. 122], which the magistrate judge denied [Docket No. 125].

dismiss to the extent it would require it to abandon its request for attorney's fees and costs. *See* Docket No. 123. On October 29, 2010, the Court dismissed plaintiff's complaint with prejudice and granted defendant leave to file an updated motion for attorney's fees and costs by November 22, 2010. *See* Docket No. 130.

Plaintiff failed to appear at the October 27 hearing. *See* Docket No. 128. One of defendant's employees, who previously worked in a cubicle adjacent to plaintiff, testified that he saw plaintiff working at the offices of Dish Network in Englewood, Colorado on Monday, October 25, 2010. Mr. Olsen did not cross-examine that witness. In light of plaintiff's failure to appear, the magistrate judge scheduled a show cause hearing for December 21, 2010. *See id.*; *see also* Docket No. 131 (ordering plaintiff to appear at the December 21 hearing to "show cause why this case should not be dismissed pursuant to Fed. R. Civ. P. 16(f) and/or 41(b), why a finding and order of contempt should not enter, and why Plaintiff should not be directed to pay defendant's reasonable expenses, including attorney fees, incurred because of Plaintiff's failure to appear as directed").

On October 28, 2010, defendant filed a Motion for Court Order to Plaintiff to Surrender Passport, and for Expedited Ruling [Docket No. 126]. Three days later, Mr. Olsen filed a document entitled "Plaintiff Moves to Withdraw Certain Pleadings and Averments That Have Been Shown to Be False (and Which Were Submitted to the Magistrate Judge)" [Docket No. 132]. Although Mr. Olsen purported to file the motion on behalf of plaintiff, he stated in the motion that he attempted to contact his client but received no response. *See* Docket No. 132 at 2, ¶ 5. Mr. Olsen then expressed his belief that his client had made false averments to the Court. However, two days after

12

filing his motion, Mr. Olsen filed plaintiff's response to defendant's motion to surrender her passport.   In the response, plaintiff, through Mr. Olsen, represented that "[i]t is now abundantly clear that plaintiff's actions to date have been in an effort to find work and survive financially – without Defendant MSN destroying her chances of obtaining (and keeping) a job."  Docket No. 135 at 1, ¶ 4.  Plaintiff cited no factual basis for that assertion, and Mr. Olsen did not explain its consistency with his pending attempt to have his client's fabrications withdrawn from the record.  Plaintiff also argued that her travels overseas to find work were precipitated by defendant's "slash-and-burn approach to this litigation."  *See* Docket No. 135 at 2-3, ¶ 11.

On November 4, 2010, the magistrate judge scheduled a November 9, 2010 hearing on defendant's motion to surrender passport and ordered plaintiff and her counsel to appear in person.  *See* Docket No. 137 (reminding plaintiff of the December 21, 2010 hearings).[6]  Plaintiff appeared at the November 9, 2010 hearing.  During the hearing, plaintiff testified that her present address was a house in London at the address she provided in her declaration, *see* Docket No. 118-1 at 2, where she claimed to have been living for three months.  *See* Docket No. 144 at 4.  Plaintiff brought her passport to the hearing.  Upon being questioned about the passport, she testified that, although she used it to travel "[f]rom the U.S.," "[w]ithin Europe" she used "a different passport because [she's] on official government business."  Docket No. 144 at 10.  Plaintiff described that second passport as "one issued by the British Government for

---

[6]On November 5, 2010, defendant filed its "Motion to Compel Disclosure of Attorney Client Communications Pursuant to the Crime Fraud Exception" [Docket No. 140].

official British work."  She further testified that she was "not allowed to bring it here because it has no bearings here, unless I'm on a business with their client that is headquartered in Britain and has satellite offices here."  Docket No. 144 at 14.  Plaintiff, who is not a British citizen, stated that the British "passport" was "issued under a work [v]isa."  Docket No. 144 at 14.

Plaintiff testified that she returned to the United States from London on November 2, 2010 for two days.  Her passport does not reflect that travel.  The absence of a stamp in her passport, she explained, was due to the fact that she was traveling on "official business for British Telecom" and therefore "used their government passport."  Docket No. 144 at 17.  Plaintiff stated that this was the same reason that other dates of travel into and out of the United States would not be reflected in her American passport.  *See id.*  Moreover, she stated that she was not permitted to bring the British travel document to the United States unless she was on official business, thus explaining why she did not bring it to the hearing despite the magistrate judge's order to bring her passport reflecting travel into and out of the United States on certain dates.  Plaintiff did not explain how she could use her British passport to enter the United States while at the same time being required to leave it in the United Kingdom.

Plaintiff testified that her travels took her out of the United States for most of July and August and that her children visited her there often.  *See id.* at 24.  She then testified, consistent with her declaration, that she in fact moved her six children to Germany in the "June/July time frame."  Docket No. 144 at 29.[7]  Plaintiff stated that they

---

[7]This conflicts with the Blackstone and Qwest employment records.

then moved to London in the "August/September time frame." *Id.* at 31. She reiterated the statement from her declaration that she could not attend the October 27, 2010 hearing because she was in London on that date. *See id.* at 32. Plaintiff disputed the testimony of the witness who claimed to have seen her at the Dish Network offices in Englewood, Colorado on October 25, 2010. *See id.* at 36.

Counsel for defendant then asked plaintiff questions about the redacted bank records plaintiff submitted in support of her contention that she was in Germany on certain dates in 2010. The bank records indicated that plaintiff was at Ramstein Air Force base in Germany on July 7, 2010, despite plaintiff's testimony earlier in the hearing that she was in London that day. Her explanation was as follows:

> A.   One of my points of presence, or POPs as they call it, is to go through Ramstein. I have to check in there for various military services if I wish to retrieve them while I'm in Europe.
>
>                                   * * *
>
> Q.   Is your testimony now that on July 7th you were in both Germany and London?
> A.   In addition to two other countries, yes, on my way.
> Q.   What two other countries?
> A.   Switzerland and France.
> Q.   Why when I asked you earlier if you were in Germany on July 7th you said no, you were in London?
> A.   Because that was my final stop. I recall you asking for my destinations not my routes. I apologize.

*Id.* at 57-58.

In light of plaintiff's testimony regarding traveling overseas with her six children in early November 2010, the magistrate judge continued the hearing until 8:00 a.m. on November 10, 2010 and ordered plaintiff to bring her children's passports to court. *See* Docket No. 144 at 89. Plaintiff appeared at the continuation of the hearing but did not bring the passports of her children [Docket No. 147]. The magistrate judge reset the

hearing for November 16, 2010 and again ordered plaintiff to bring her children's passports to that hearing.  *See id.* at 2.[8]  Furthermore, he ordered the parties to brief the issue of whether there is any British or American law that suggests that an American citizen who has a British passport or work visa is prohibited from bringing such a document into the United States.  *See id.* at 2.

Plaintiff did not appear at the November 16, 2010 hearing [Docket No. 149].  The magistrate judge issued another Order to Show Cause [Docket No. 150] requiring plaintiff to appear on December 21 to show cause why she should not be found in contempt.  The magistrate judge further ordered plaintiff to "bring . . . her British passport, British visa, and the passports of her six children" to the December 21 hearing.  *See id.* at 3.

On December 8, 2010, the magistrate judge denied the filing entitled "Plaintiff Moves to Withdraw Certain Pleadings and Averments That Have Been Shown to Be False (and Which Were Submitted to the Magistrate Judge)" [Docket No. 132], stating that

> [a]s noted by defendant, since the filing of the motion, plaintiff has appeared before this court and under oath reaffirmed statements her counsel seeks to withdraw. Furthermore, the pleadings and averments plaintiff seeks to withdraw may very well be relevant to the collateral matters still pending and thus may be considered by Judge Brimmer and Magistrate Judge Watanabe during the hearings set before them on December 21, 2010.

Docket No. 170.  That same day, the magistrate judge granted defendant's motion for

---

[8]The magistrate judge also ordered the parties to subpoena plaintiff's husband so that he would produce the passports for the November 16, 2010 hearing.  *See* Docket No. 147 at 2.

plaintiff to surrender her passport [Docket No. 171], outlining in great detail the history of the proceedings to date.  The passport submitted to the Court at the hearing on the motion was received into the Registry of the Court [Docket No. 173].

Plaintiff filed her response [Docket No. 181] to defendant's renewed motion for fees and costs [Docket No. 160] on December 16, 2010.  In plaintiff's response, Mr. Olsen again accused defendant of creating a "sideshow" and stated that the stay of discovery "tied [his] hands."  Docket No. 181 at 1.  Mr. Olsen also proffered evidence regarding his efforts to confirm information with plaintiff and to inform her of the need to comply with court orders.

This Court held a hearing on defendant's motion for fees and costs [Docket No. 160] on December 21, 2010.  Plaintiff entered the courtroom approximately 13 minutes after the hearing commenced.  Defendant's first witness, Seth Kotowske, was a payroll administrator at Blackstone.  Through Mr. Kotowske's testimony, defendant proffered evidence of plaintiff's employment with Blackstone during 2009.  For instance, defendant supplied an employer/employee services agreement entered into between Blackstone and plaintiff, *see* Def. Ex. A2, as well as W-4, I-9, and direct deposit forms completed by plaintiff, *see* Def.'s Exs. A3, A4, A5.  Mr. Kotowske also testified regarding time sheets signed by plaintiff reflecting hours worked as well as a Blackstone report of wages and hours worked by plaintiff.  *See* Def.'s Exs. A6, A8.  Mr. Kotowske testified that the report of wages accurately reflected the money paid to plaintiff.  Earnings were also reflected in a W-2 wage and tax statement issued to plaintiff for 2009.  *See* Def.'s Ex. A9.  Mr. Olsen did not object to the admission of these records.

17

After Mr. Kotowske completed his testimony, Mr. Olsen requested permission for plaintiff to leave the courtroom to go to the bathroom.  At this point in the hearing, Melissa Bird, the lead financial analyst in the payroll department of Qwest Corporation, took the stand.  She testified that plaintiff worked at Qwest between June 22, 2009 and August 16, 2010, with an annual salary of $110,000.  Ms. Bird testified regarding records reflecting this employment relationship.  *See* Def. Exs. A11, A12, A13.  Ms. Bird testified that Qwest paid plaintiff $91,584.59 in 2010.  Mr. Olsen posed no objection to the admission of these records.  Mr. Olsen asked Ms. Bird regarding an internal investigation into plaintiff's dispute with the amount shown on her W-2 and her claim that her wages had been frozen.  Ms. Bird stated that she had no knowledge of an investigation or pay freeze.

Linda Gibbons, who was the senior recruiting specialist in the human resources department of Qwest during the May to July 2009 time period, testified regarding the process used to verify that plaintiff was permitted to work in the United States.  Plaintiff submitted a Social Security card with her name and the 262 number.  *See* Def.'s Ex. A14.  Plaintiff and Mr. Olsen have never explained how this is consistent with plaintiff's prior contentions that the 262 number constituted some alternative or temporary number, rather than a SSN.  When Qwest submitted the SSN provided by plaintiff, the Department of Homeland Security was unable to verify plaintiff's status.  *See* Def.'s Ex. A16 (E-Verify Notice to Employee of Tentative Nonconfirmation indicating that SSN does not match); *see also* Def.'s Ex. A15.  Plaintiff then supplied Qwest with what she described as a "temporary" number which was plaintiff's 419 SSN hyphenated differently than a SSN.  *See* Def.'s Ex. A17; *see also* Def.'s Ex. A19.  Ms. Gibbons

18

testified that, upon entering the 419 number, plaintiff was verified for employment.

The Court also heard testimony from Shawna Reid, an operations supervisor at the Social Security Administration in Denver.  She testified that the 262 SSN was not associated with plaintiff.  Ms. Reid also stated that the form plaintiff submitted to Qwest purporting to be a SSA receipt indicating issuance of a "temperary [sic] verification number" starting with "41-9," *see* Def.'s Exs. A17, A19, is not a form used by the SSA. She further testified that the SSA never gives out temporary numbers.  Sandra Prince then testified by phone that the 262 number was her SSN and that she had not given plaintiff permission to use it.

Defendant had no other witnesses to call.  Mr. Olsen sought to call plaintiff to the stand, but she was still in the bathroom and reported to Mr. Olsen's co-counsel[9] that she was sick.  Mr. Olsen sought to testify, despite still representing plaintiff, in order to vouch for the fact that she "proceeded in good faith."  The Court denied that request.  In light of plaintiff's illness, the Court continued the hearing until December 27, 2010.  Mr. Olsen's co-counsel was instructed to inform plaintiff that the Court ordered her to appear on December 27 continuation of the hearing.[10]

---

[9]Mr. Olsen's law partner, Diane MacArthur Brown, entered her appearance on behalf of plaintiff on December 20, 2010.  *See* Docket No. 187.  She file a motion to withdraw as attorney for plaintiff on March 14, 2011, *see* Docket No. 220, which the magistrate judge granted on March 28, 2011.  *See* Docket No. 247.

[10]In light of plaintiff's illness, she did not appear for the show cause hearing before the magistrate judge, which was set to commence after completion of the hearing on the motion for attorneys fees held by the Court that morning, during which plaintiff claimed she became ill.  The magistrate judge reset the show cause hearing for January 31, 2011.  *See* Docket No. 189].  Plaintiff failed to appear at the continued show cause hearing.  *See* Docket No. 193.

Plaintiff did not appear on December 27, 2010.  *See* Docket No. 192.  Plaintiff called the clerk's office on the morning of the hearing to inform the Court that she could not attend the hearing because she was in the hospital having medical tests conducted.  *See* Docket No. 244 at 3.  Mr. Olsen stated that plaintiff had informed him that she did not intend to testify.  The Court then heard argument from both parties.  Mr. Olsen stated that the basis for his reasonable belief in plaintiff's assertions was plaintiff's statements to him.  He offered no other evidence.  Nor did he substantiate how in good faith he continued to believe her despite the voluminous evidence indicating that she lied about her employment, location, and SSN in filings he signed and supported through his own declarations.  The Court took the motion under advisement.

On February 2, 2011, the magistrate judge, in an order granting defendant certain fees and costs, ordered plaintiff to show cause in writing by February 16, 2011 why she should not be found in contempt "for repeatedly failing to appear before this court as directed and for repeatedly failing to comply with this court's Order to produce the U.S. passports of her six children, her alleged British passport, visa, or other travel document." Docket No. 194 at 12.  On February 20, 2011, Mr. Olsen filed a document entitled "Plaintiff's Response to Show Cause Order" [Docket No. 202], asserting that plaintiff had "ceased communicating" with him.  He, nevertheless, continued to represent her.

On February 8, 2011, the Court issued a Minute Order stating that

> During the December 27, 2010 hearing, counsel for defendant averred "that had the case been shut down in February or March [of 2010], whether through plaintiff's counsel's actions or his withdrawal or something, somewhere between 65, probably 50 and 65 percent of the fees that we spent in this case would not have been spent."  Defendant has documented

the fees it incurred in litigating the motion for attorneys' fees. *See* Docket No. 182. It has yet to document the fees it is requesting pursuant to the underlying motion. In the event the Court determines that a fee award is justified, the record is devoid of a basis upon which to calculate any award.

Docket No. 197. The Court, therefore, ordered defendant to file its fee request by February 18, 2011, specifically identifying those fees referenced during the December 27, 2010 hearing. *See id.* Defendant filed an affidavit by defendant's counsel Julie Walker, which stated the total amounts incurred in the litigation and also broke the fees and costs down by month. *See* Docket No. 201-1; *see* Docket No. 203-1 (corrected affidavit).[11]

Mr. Olsen sought to withdraw as plaintiff's counsel on March 14, 2011, citing the fact that defendant had requested that the Colorado Office of Attorney Regulation initiate an investigation into his conduct and that plaintiff had ceased communicating with him. *See* Docket No. 219. Despite this fact, Mr. Olsen filed a response [Docket No. 227] to defendant's motion for attorney's fees and costs entitled "Plaintiff's Opposition to Defendant's Legal Fee Submission (Docket No. 201-1)" on March 17, 2011.

On March 28, 2011, Mr. Olsen filed a motion to withdraw [Docket No. 245] his earlier motion to withdraw as plaintiff's counsel [Docket No. 219]. He represented to the Court that plaintiff had provided what he deemed to be "cogent" explanations for her

---

[11]On February 22, 2011, the magistrate judge ordered plaintiff to appear on March 23, 2011 to show cause why she should not be found in contempt. *See* Docket No. 205. He also ordered the U.S. Marshals Service to serve her with a copy of the order. On February 24, 2011, the magistrate judge reset the hearing for March 21 [Docket No. 208] and issued an amended order to show cause reflecting that date [Docket No. 209].

failure to communicate and attend previous hearings.  *See* Docket No. 245.  Mr. Olsen

did not address the other stated basis for his motion to withdraw as plaintiff's attorney.

The magistrate judge permitted Mr. Olsen to withdraw his motion to withdraw as

plaintiff's attorney, and Mr. Olsen remained in the case as counsel for plaintiff.[12]

Despite his March 28, 2011 request to remain as plaintiff's counsel, Mr. Olsen renewed

his request to withdraw as plaintiff's attorney on May 27, 2011, citing plaintiff's failure to

participate in the case "for well over six months (except to appear for some, but not all,

procedural hearings)."  *See* Docket No. 269 at 2.  The magistrate judge denied Mr.

Olsen's request to withdraw as counsel on June 1, 2011.  *See* Docket No. 278.[13]

## II.  ANALYSIS

Defendant seeks the attorneys' fees and costs it expended since the initiation of

the lawsuit from plaintiff and those it expended after the February 18, 2010 filing of its

motion to compel discovery responses [Docket No. 16] from plaintiff's counsel.  In

support of its request for such awards, defendant cites 28 U.S.C. § 1927, Title VII,

Federal Rules of Civil Procedure 11, 26, and 37, and the Court's inherent power.

Section 1927 provides that "[a]ny attorney or other person admitted to conduct

---

[12]Mr. Olsen also filed a motion for sanctions against defendant and counsel for defendant on March 28, 2011, *see* Docket No. 248, a response to which defendant filed on April 21, 2011.  *See* Docket No. 256.

[13]In light of the Advisement of Contempt, the Court held a contempt hearing on June 15, 2011.  The Court concluded that it was not clear whether the contempt to which the magistrate judge had referred was civil or criminal contempt.  On June 21, 2011, the magistrate judge certified facts pursuant to 28 U.S.C. § 636(e) and recommended that the Court require plaintiff to show cause why she should not be adjudged in both civil and criminal contempt.  *See* Docket No. 293.  The Court does not address the contempt issue in this Order.

cases in any court in the United States or any Territory thereof who so multiplies the

proceedings in any case unreasonably and vexatiously may be required by the court to

satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred

because of such conduct." 28 U.S.C. § 1927. The aim of § 1927 is to ensure that

attorneys "regularly re-evaluate the merits of their claims and to avoid prolonging

meritless claims." *Steinert v. Winn Group, Inc.*, 440 F.3d 1214, 1224 (10th Cir. 2006).

Rule 11(b) of the Federal Rules of Civil Procedure provides as follows:

By presenting to the court a pleading, written motion, or other
paper--whether by signing, filing, submitting, or later advocating it--an
attorney or unrepresented party certifies that to the best of the person's
knowledge, information, and belief, formed after an inquiry reasonable
under the circumstances:
(1) it is not being presented for any improper purpose, such as to
harass, cause unnecessary delay, or needlessly increase the cost
of litigation;
(2) the claims, defenses, and other legal contentions are warranted
by existing law or by a nonfrivolous argument for extending,
modifying, or reversing existing law or for establishing new law;
(3) the factual contentions have evidentiary support or, if
specifically so identified, will likely have evidentiary support after a
reasonable opportunity for further investigation or discovery; and
(4) the denials of factual contentions are warranted on the evidence
or, if specifically so identified, are reasonably based on belief or a
lack of information.

Fed. R. Civ. P. 11(b). "If, after notice and a reasonable opportunity to respond, the

court determines that Rule 11(b) has been violated, the court may impose an

appropriate sanction on any attorney, law firm, or party that violated the rule or is

responsible for the violation." Fed. R. Civ. P. 11(c)(1). The obligations imposed by

Rule 11 are ongoing. *See* Fed. R. Civ P. 11, Notes to 1993 Amendments ("[A] litigant's

obligations with respect to the contents of these papers are not measured solely as of

the time they are filed with or submitted to the court, but include reaffirming to the court

and advocating positions contained in those pleadings and motions after learning that they cease to have any merit.").

Defendant also invokes Title VII's provision that, "[i]n any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee . . . as part of the costs."  42 U.S.C. § 2000e-5(k).  Defendant may only recover its fees pursuant to § 2000e-5(k) upon showing that "plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith."  *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978); *see Twilley v. Integris Baptist Medical Center, Inc.*, 16 F. App'x 923, 925-26 (10th Cir. 2001) ("Th[is] standard . . . is met when a party utterly fails to produce any evidence in support of material issues necessary to withstand summary judgment.").  Moreover, both Rules 26 and 37 of the Federal Rules of Civil Procedure provide authority for awarding sanctions specifically arising out of discovery violations.  *See* Fed. R. Civ. P. 26(g)(3); Fed. R. Civ. P. 37(b)(2)(C) & (d).  For instance, Rule 26(g) imposes obligations similar to those found in Rule 11 upon attorneys and parties signing discovery requests, responses, or objections.

### A.  Plaintiff

Defendant invokes the Court's "inherent authority to impose sanctions for bad faith conduct in litigation," Docket No. 160 at 17 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 49 (1991)), as the basis for its request for fees and costs since the initiation of this suit by plaintiff.  *See* Docket No. 244 at 38.

The Court finds that, once defendant started discovery into plaintiff's claims, as in *Chambers*, plaintiff's "entire course of conduct . . . evidenced bad faith and an

attempt to perpetrate a fraud on the court." 501 U.S. at 51. For example, plaintiff lied under oath about not working after her termination when, in fact, she had secured high paying jobs with Blackstone and Qwest; plaintiff lied about her Social Security Numbers and her use of an innocent woman's SSN for her own purposes; and plaintiff gave preposterous testimony about moving to Germany and having a special British passport when her own passport showed no such travel. Clearly, plaintiff's conduct merits sanctions.

However, although defendant seeks from plaintiff all of the fees and costs it incurred in this action, defendant has failed to show that, at the time of filing this action, plaintiff had no reasonable basis to assert her claims. That she later fabricated evidence and lied about damages does not, without more, render her original assertion of claims sanctionable.[14] The Court finds there is insufficient evidence in the record to find that plaintiff's conduct in this litigation during October, November, and December of 2009 warrants an award of sanctions against her.

On January 6, 2010, defendant supplied plaintiff with records of her employment with Qwest. *See* Def.'s Ex. A30. The January 6 letter made it abundantly clear that the issue of her post-termination employment would be a central issue in this case. Yet, on

---

[14]Furthermore, defendant fails to establish that the original case, at its inception, was frivolous. *See Twilley v. Integris Baptist Medical Center, Inc.*, 16 F. App'x 923, 925-26 (10th Cir. 2001) ("[A] prevailing defendant in an action brought under Title VII of the Civil Rights Act of 1964 should ordinarily only recover attorney's fees if the district court finds 'that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith.' . . . Th[is] standard . . . is met when a party utterly fails to produce any evidence in support of material issues necessary to withstand summary judgment.") (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978)).

January 13, 2010, plaintiff signed a response to a request for admission wherein she denied that she had "been employed in any capacity" since January 16, 2009.  Docket No. 82-18 at 4.  On February 1, 2010, defendant supplied plaintiff's counsel with documents evidencing plaintiff's employment with Blackstone.  *See* Docket No. 160-6 at 2; *see also* Docket No. 160-6 at 3 (producing additional documentation of employment to plaintiff's counsel on February 9, 2010).  On March 16, 2010, plaintiff responded to an interrogatory by contending that she had "not been employed for compensation."  Docket No. 82-21 at 5.[15]  The Court finds that these misstatements were knowingly made in an effort to continue seeking a damages award to which plaintiff was not entitled.  By lying on these discovery responses, plaintiff attempted to commit a fraud on this Court and defendant.  These lies are the first acts of misconduct relating to the litigation of this case and are undoubtedly sanctionable.  Her subsequent lies and misconduct, as recounted above, are similarly subject to sanction.

## B.  Plaintiff's Counsel

The detailed discussion of this case's background reveals what should have been obvious to Mr. Olsen, i.e., that throughout this case plaintiff consistently lied to him, to defendant, and to the Court.  For example, plaintiff stated that she had not been employed for compensation since being terminated by defendant.  That was not true, and defendant supplied Mr. Olsen with voluminous evidence revealing plaintiff's lie.  Plaintiff testified that she and her family had been provided with special identification numbers due to her husband's employment.  Defendant demonstrated that this was an

---

[15]On July 29, 2010, plaintiff reiterated that, as of March 16, 2010, she "had not gotten a regular job again."  Docket No. 82-23 (M. Mellott Decl.) at 15, ¶ 75.

evolving construction to hide the fact that plaintiff misused another person's SSN.

Plaintiff told Mr. Olsen that she had moved to Germany.  She had not.  Upon receiving

overwhelming evidence that plaintiff had been regularly employed in Colorado while

using another person's SSN in her new position, Mr. Olsen's approach remained

unchanged.  He continued to not only advocate plaintiff's positions, despite her

persistent attempts to mislead defendant and the Court, but also filed personal

declarations in support of her contentions.  Mr. Olsen should have been skeptical of

many of his client's contentions, which were implausible on their face, before defendant

revealed they were lies.  Once in possession of evidence that, for example, his client

was attempting to recover damages for which she was not entitled through

misstatements to defendant and the Court, Mr. Olsen had no basis to persist in

pursuing her original claims.  His decision to do so assisted plaintiff in proceeding with

an overbroad claim for damages against defendant.

An attorney can be sanctioned for "unreasonably and vexatiously" multiplying the

proceedings.  *See* 28 U.S.C. § 1927 ("Any attorney or other person admitted to conduct

cases in any court in the United States or any Territory thereof who so multiplies the

proceedings in any case unreasonably and vexatiously may be required by the court to

satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred

because of such conduct.").  The foregoing discussion highlights the voluminous

evidence defendant supplied to Mr. Olsen after the filing of this case indicating that his

client was being untruthful with him and the Court.  Mr. Olsen persisted, and still

persists, in vouching for the overall veracity of his client.  That persistence appears to

stem from his belief that plaintiff had meritorious claims.  Counsel for defendant,

however, made clear during the December 21, 2010 hearing that defendant is not arguing that plaintiff or Mr. Olsen violated Federal Rule of Civil Procedure 11 by filing the complaint.

Mr. Olsen's focus on his reasons for believing plaintiff at the outset of this case fails to address his ongoing obligations as the case proceeded.  "[A]lthough a case may not be frivolous when filed, the continued prosecution of an action after it has become apparent that it is meritless will warrant sanctions under § 1927." *Shackelford v. Courtesy Ford, Inc.*, 96 F. Supp. 2d 1140, 1144-45 (D. Colo. 2000); *see Steinert v. Winn Group, Inc.*, 440 F.3d 1214, 1224 (10th Cir. 2006) (noting that § 1927 is aimed at ensuring that attorneys "regularly re-evaluate the merits of their claims and to avoid prolonging meritless claims."); *Roth v. Struell*, No. 09-1453, 2010 WL 2881532, at *5 (10th Cir. July 22, 2010) (upholding conclusion that counsel, upon being notified of a controlling case requiring dismissal, "should have voluntarily dismissed the complaint"); *Medtronic Navigation, Inc. v. Brainlab Medizinische Computersystems BMBH*, No. 98-cv-01072-RPM, 2008 WL 410413, at *10 (D. Colo. Feb. 12, 2008).

In support of the reasonableness of his continued support of his client's disproved representations to the Court, Mr. Olsen cites no persuasive evidence other than statements by his client, whose credibility evaporated early in the litigation.  He avers that he "has never failed to assist victims of discrimination just because the defense was going to be difficult or the defendant was a multi-billion-dollar company." Docket No. 181 at 8.[16]  The motion before the Court, however, does not argue that

---

[16]Plaintiff also argues that, in light of defendant's "standing down" and the stay of discovery, she was prevented from gathering evidence to support her claims.  "Under

28

counsel should fail to assist victims in such cases.  Instead, the motion contends that counsel should not assist clients who make factual misrepresentations and fabricate evidence.  Plaintiff's counsel also asserts that plaintiff had the right to "fairly" press her claims.  *See* Docket No. 181 at 9.  However, defendant's motion seeks sanctions not because plaintiff was fair but because plaintiff was dishonest.

An attorney cannot claim that he took his client's word, without further inquiry, if doing so was objectively unreasonable.  In the Tenth Circuit, a showing of bad faith is not required before a Court imposes sanctions pursuant to § 1927.  *See Hamilton v. Boise Cascade Express*, 519 F.3d 1197, 1202 (10th Cir. 2008).  In other words, counsel is not permitted to blind himself to changed circumstances and later claim that he acted with a "pure heart."  *See id.* at 1203 ("Where, 'pure heart' notwithstanding, an attorney's momentarily 'empty head' results in an objectively vexatious and unreasonable multiplication of proceedings at expense to his opponent, the court may hold the attorney personally responsible.").

In *Hamilton*, the sanctioned attorney argued on appeal that his conduct "was but one 'isolated incident' of misconduct."  *Hamilton*, 519 F.3d at 1203.  The Tenth Circuit found that § 1927 "sanctions are not reserved for the worst offenders," because they "are levied to compensate the victims of dilatory practices, not as a means of punishment."  *Id.*; *see Gruppo v. FedEx Freight Systems, Inc.*, No. 05-cv-02370-MSK-KLM, 2008 WL 3211287, at *5 (D. Colo. Aug. 6, 2008).  Therefore, for purposes of

---

such circumstances," plaintiff contends "the defense should not be heard to complain that plaintiff has no evidence."  Docket No. 181 at 9.  That is not the defendant's complaint.

§ 1927, the lie or disabused theory would have to be sufficiently serious so as to have led to the multiplication of proceedings and additional cost to defendant.  For example, in *Gruppo*, it was sufficient that counsel persisted in advancing a meritlessly overbroad claim.  *See Gruppo*, 2008 WL 3211287, at *8.  Here, upon being provided with evidence that plaintiff had obtained new employment, Mr. Olsen continued to advance an overbroad damages request.  Furthermore, although plaintiff's fabrication of evidence may not have established that her claims had no merit, it undermined at least aspects of her allegations of gender discrimination.  Even if such falsehoods did not always implicate one of plaintiff's claims, the fact that she made such statements, and that Mr. Olsen supported them, predictably led defendant and at times the magistrate judge, *see* Docket No. 144 at 71-80, into protracted efforts to root out her lies.

In the face of the overwhelming evidence of his client's continual lies, Mr. Olsen accused defendant of creating a "sideshow" and asserted that the stay of discovery "tied [his] hands."  Docket No. 181 at 1.  Plaintiff's response, however, contains no explanation of how discovery into the claims asserted by plaintiff was relevant to the issues surrounding her use of a false SSN, her misstatements about her travels and those of her husband, her employment by Blackstone and Qwest, and the fabrication of evidence in support of her claims.  *See* Docket No. 181.  While Mr. Olsen stands behind the merits of his client's case, he fails to explain why he assisted her in making these falsehoods to the Court and to defendant.  That assistance clearly resulted in the unreasonable multiplication of the proceedings.  *See* 28 U.S.C. § 1927.  This Court and the magistrate judge have already held over nine hours of hearings related to sanction issues alone and have spent countless additional hours outside the courtroom on such

30

issues.

In addition to § 1927, Rule 11 imposed similar ongoing obligations upon Mr.

Olsen, while not requiring a showing that any violations of the rule resulted in

multiplication of the proceedings.[17]  *See* Fed. R. Civ P. 11, Notes to 1993 Amendments

("[A] litigant's obligations with respect to the contents of these papers are not measured

solely as of the time they are filed with or submitted to the court, but include reaffirming

to the court and advocating positions contained in those pleadings and motions after

learning that they cease to have any merit.").  The advisory committee notes, however,

make clear that "Rule 11 motions should not be made or threatened for minor,

inconsequential violations of the standards prescribed by subdivision (b)."

---

[17]As noted above, defendant seeks sanctions against plaintiff's counsel pursuant to Federal Rule of Civil Procedure 11. "If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1).  Rule 11, however, requires that a motion for sanctions "be made separately from any other motion" and "must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets."  Fed. R. Civ. P. 11(c)(2).  Defendant did not comply with the procedural requirements of Rule 11 upon filing its motion to dismiss, within which defendant included a request for sanctions, on June 10, 2010.  *See* Docket No. 51.  On October 29, 2010, the Court granted defendant leave to file a motion for sanctions no later than November 22, 2010. *See* Docket No. 130.  This would not have provided defendant sufficient time to draft the motion and supply a copy to plaintiff and her counsel within the twenty-one day "safe harbor" provided by Rule 11.  Defendant's first motion, the Court's October 29 order, and the hearing on the renewed motion, however, all provided Mr. Olsen with sufficient notice that he might be subject to sanctions under Rule 11.  Fed. R. Civ. P. 11(c)(1) ("If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.").

Here, the unfounded contentions advocated by Mr. Olsen were not "isolated."  At every turn, he continued to espouse, and assist his client in espousing, what were clearly false statements by plaintiff.  Of particular note, Mr. Olsen was aware of the fact that plaintiff's husband had not been relocated prior to responding to defendant's motion.  *See* Docket No. 104-1 at 2, ¶ 3.  In fact, Mr. Olsen apparently contacted Major Richard A. Williams, a representative of the Air Force Academy where Mr. Mellott was then stationed, to request a declaration confirming Mr. Mellott's relocation.  Upon receiving information to the contrary, Mr. Olsen persisted in contending that Mr. Mellott had been relocated.  *See* Docket No. 98-2.  Mr. Olsen also sent an abusive email to Major Williams.  *See* Docket No. 104-2.  In other words, Mr. Olsen appears to have conducted at least some independent investigation.  He, therefore, cannot contend that he had no basis to disbelieve his client or that he acted in good faith.  The email he sent to Major Williams demonstrates either a total disregard for the overwhelming evidence contradicting his client's accounts or an affirmative attempt to intimidate a potential witness into withdrawing declarations Mr. Olsen knew to be true.

Moreover, Mr. Olsen admitted that he had assisted his client in making false statements.  On October 31, 2010, Mr. Olsen filed a document entitled "Plaintiff Moves to Withdraw Certain Pleadings and Averments That Have Been Shown to Be False (and Which Were Submitted to the Magistrate Judge)" [Docket No. 132].  Although Mr. Olsen purported to file the motion on behalf of plaintiff, he stated in the motion that he attempted to contact his client but received no response.  See Docket No. 132 at 2, ¶ 5. Mr. Olsen then expressed his belief that his client had made certain limited false averments to the Court.  Despite the foregoing, Mr. Olsen never corrected or withdrew

32

the vast majority of his client's misstatements and, indeed, continued to "reaffirm[] to the court and advocat[e] positions contained in . . . pleadings and motions after learning that they cease[d] to have any merit."  Fed. R. Civ P. 11, Notes to 1993 Amendments; *see Young v. Corbin*, 889 F. Supp. 582, 585 (N.D.N.Y. 1995) ("The focus of Fed. R. Civ. P. 11 is to emphasize the duty of candor by subjecting litigants to potential sanctions for insisting upon a position after it is no longer tenable and by generally providing protection against sanctions if they withdraw or correct contentions after a potential violation is called to their attention.").

No later than April 20, 2010, upon receiving defendant's letter outlining evidence of plaintiff's misstatements up to that point, Mr. Olsen was on notice of his client's material misstatements regarding her employment status.  By assisting her in her continued unfounded statements after that date, Mr. Olsen unreasonably multiplied the proceedings in violation of § 1927 and reaffirmed false statements found in previous filings in violation of Rule 11.

The Court concludes that Mr. Olsen's conduct exceeded mere objective unreasonableness.  The source of authority for sanctions thereby arises from the Court's inherent authority, in addition to 28 U.S.C. § 1927 and Fed. R. Civ. P. 11.  *See Braley v. Campbell*, 832 F.2d 1504, 1510 (10th Cir. 1987) ("To deter frivolous and abusive litigation and promote justice and judicial efficiency, the federal courts are empowered to impose monetary sanctions, by statutes and the rules of civil and appellate procedure as well as their inherent right to manage their own proceedings."); *see Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 258-59 (1975) (stating that courts can award attorney's fees pursuant to their inherent power if a party

"acted in bad faith, vexatiously, wantonly, or for oppressive reasons").

### C. Sanction Calculation

The Court has determined that sanctions are appropriate against both plaintiff and her attorney.  The next issue is pursuant to which statute, for what purposes, and in what amount.

When awarding sanctions against counsel pursuant to § 1927, the Tenth Circuit has held that the court "must state with specificity 'the excess costs providing a basis for the sanctions,' 'the conduct leading to the sanctions,' and 'the reason for the sanction.'" *Hamilton*, 519 F.3d at 1204 (citations omitted).  As stated earlier, a sanction pursuant to § 1927 is aimed at compensating the opposing party.  *Hamilton*, 519 F.3d at 1205.  Therefore, the sanction need not be the "least severe sanction adequate to deter and punish," *White*, 908 F.2d at 684, which guides Rule 11 awards.

Because Rule 11 is primarily punitive, rather than compensatory, the ability to pay is a proper consideration.  *See White*, 908 F.32d at 685.  In § 1927 evaluations, the attorney's ability to pay is not a consideration.  *See Roth v. Spruell*, No. 09-1453, 2010 WL 2881532, at *4 (10th Cir. July 22, 2010) (citing *Hamilton*, 519 F.3d at 1206); *see also Roth v. Green*, No. 02-cv-01116-LTB-CBS, 2008 WL 3845422, at *3 n.2 (D. Colo. Aug. 14, 2008) ("The cost-recovery objective underlying § 1927 is also incorporated in Rule 37(a)(5)(A) . . . .  Similarly, Rule 37(c)(1)(A) authorizes the court to order 'payment of the reasonable expenses, including attorney's fees, caused by' the nonmoving party's failure to disclose under Fed. R. Civ. P. 26(a) or (e).").  Furthermore, Rule 11 sanctions "should ordinarily be paid into court as a penalty," though may be ordered paid to the opposing party.  Fed. R. Civ. P. 11, Notes to 1993 Amendments.

In determining how these provisions justify an award of sanctions against plaintiff and Mr. Olsen, however, defendant has failed to provide the Court with proper information.  Rule 54.3 of the Local Rules of Practice provides that motions for attorney's fees "shall include the following for each person for whom fees are claimed: 1. a detailed description of the services rendered, the amount of time spent, the hourly rate, and the total amount claimed; and 2. a summary of relevant qualifications and experience."  D.C.COLO.LCivR 54.3.  Defendant initially included its request for fees in a motion to dismiss filed on June 10, 2010 without complying with Local Rule 54.3.[18] On November 23, 2010, defendant renewed its motion for attorney's fees [Docket No. 160] but once again failed to include a properly supported fee request.  On February 8, 2011, the Court entered a Minute Order stating that, "[i]n the event the Court determines that a fee award is justified, the record is devoid of a basis upon which to calculate any award."  Docket No. 197.  Believing "it most efficient to resolve the motion without requiring additional proceedings," the Court ordered defendant to specifically identify those fees it sought to recover.  *Id.*  Defendant filed an affidavit by defendant's counsel, which stated the total amounts incurred in the litigation and also broke the fees and costs down by month.  *See* Docket No. 201-1; *see* Docket No. 203-1 (corrected affidavit).  As Mr. Olsen accurately pointed out in response, defendant failed to "'submit[] meticulous, contemporaneous time records that reveal, for each lawyer for whom fees are sought, all hours for which compensation is requested and how those hours were allotted to specific tasks.'"  Docket No. 227 at 1 (quoting *Case v. Unified*

---

[18]*Cf.* Fed. R. Civ. P. 11(c)(2) ("A motion for sanctions must be made separately from any other motion . . . .").

*School Dist. No. 233*, 157 F.3d 1243, 1250 (10th Cir. 1998)) (emphasis omitted). Thereafter, defendant filed without leave of the Court a "supplement" to its fee request consisting of over 200 pages of billing records without any description or briefing in support of them.  *See* Docket No. 234.  The Court struck that filing.  Defendant nevertheless attached the billing records to its reply brief in support of the motion for attorney's fees.  One effect of merely attaching such records to a reply brief is that plaintiff and Mr. Olsen could not properly respond to them.  Even if Mr. Olsen had obtained a copy from defendant before filing plaintiff's response, he still did not know to what extent, if any, defendant intended to rely on them.

In short, despite multiple opportunities to do so, defendant has never delineated those "'excess costs providing a basis for the sanctions,'" *Hamilton*, 519 F.3d at 1204 (§ 1927), or explained how the total amounts incurred after certain dates constituted the "least severe sanction adequate to deter and punish," *White*, 908 F.2d at 684 (Rule 11). Instead, defendant insists on its entitlement to all of the fees and costs it incurred after certain dates, apparently adopting the view that the request is reasonable on its face and complies with the aforementioned requirements imposed by § 1927 and Rule 11.

In determining the reasonableness of a fee requested pursuant to § 1927, the Court is permitted to consider a "straight fee" request instead of applying the "lodestar" method; the latter "would limit the amount recoverable to the prevailing rate charged by local counsel."  *Hamilton*, 519 F.3d at 1206-07 (holding that the district court may exercise its discretion in determining whether to award a "straight fee recovery or a lodestar-limited recovery"); *see United States ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.*, --- F. Supp. 2d ----, 2011 WL 2174413, at *2 (D. Colo. June 2, 2011) ("The

36

'lodestar'—the reasonable number of hours spent multiplied by a reasonable hourly rate—is the 'presumptively reasonable' attorneys' fee."). In calculating a straight fee recovery, a court's focus is on the amount actually incurred, yet a finding of reasonableness is still required. *See Hamilton*, 519 F.3d at 1207 (emphasizing that "Section 1927 . . . limits recovery to fees '*reasonably* incurred'" which "require[s] a court to lop off hours unreasonably incurred" when determining a straight fee recovery).

Defendant seeks its fees and costs from the filing of the case from plaintiff and since February 18, 2010 from Mr. Olsen. The amounts of its requests are astounding – over $500,000 in fees from the beginning of the case and over $300,000 since February 18, 2010. As noted above, defendant has not delineated the precise hours for which it seeks to recover pursuant to § 1927, and the size of the request seems to contradict its "reasonableness." The Court, therefore, cannot calculate an appropriate "straight fee recovery."

Application of the "lodestar" method is also not possible on this record. Defendant has not attempted to differentiate its fees in any way. While defendant believes that it is entitled to all of its fees regardless of what tasks such fees reflect, that is not a proper basis for an award of fees and costs in this case. As stated earlier, defendant has not shown that this case was frivolous or meritless when filed. Indeed, defendant's counsel also conceded that, in the absence of the request for lost wages, plaintiff would still have had a remaining request for emotional distress damages. *See* Docket No. 244 at 29. Yet, defendant did not estimate how much the case, properly advanced by plaintiff, would have cost defendant to litigate up to the point where this case was dismissed.

37

Another impediment to the Court calculating a proper lodestar amount is the difficulty of the Court determining from defendant's billing records whether defendant properly mitigated its damages. *See Hamilton*, 519 F.3d at 1204 (requiring party seeking sanctions "to minimize damage after counsel's violation of § 1927") (emphasis omitted); *Napier v. Thirty or More Unidentified Federal Agents, Employees or Officers*, 855 F.2d 1080, 1092 (3d Cir. 1988) ("Although Rule 11 sanctions are designed to deter frivolous lawsuits, the victim of a frivolous lawsuit is charged with a duty to mitigate, using reasonable means to terminate the litigation and to prevent the costs of that frivolous suit from becoming excessive."). It is understandable that defendant, when it realized that plaintiff was working after her termination, investigated her employment and then expanded the scope of its investigation when plaintiff's lies and fabrications seemed to have no end. However, determining the reasonableness of its request for sanctions requires a segregation of what defendant properly needed to do to defend the case from those fees expended in a no-holds-barred campaign to expose the depths of plaintiff's sins and those of her attorney. Defendant, of course, had every right to pursue the latter tack, even if doing so was to some extent motivated by righteous indignation or morbid curiosity. However, when it comes to asking the Court to award fees and costs for such efforts, one would have expected defense counsel, especially in a case overseen by a senior attorney, to have exercised their judgment in making such segregation and not simply to have shifted that burden to the Court. *Cf. Gruppo*, 2008 WL 3211287, at *6 ("Rather than specifically pointing to any particular acts that they contend unnecessarily multiplied the costs of proceedings, the Defendants offer only a general chronology, freely mixing references to conduct that may be sanctionable with

38

that which may not.  The Court will not perform the Defendants' work, and will only

examine those actions that . . . clearly stand out in the Defendants' recitation.").

Of the attorney time spent by defendant's counsel on this matter, more than half

was spent by Julie Walker, a partner at the law firm representing defendant.  *See*

Docket No. 203-1 at 4.  Most of her time was incurred after it became clear that plaintiff

and her counsel were filing false statements with the Court and consisted of efforts to

uncover those misstatements.  Such work did not require the experience and expertise

of a partner.  More of those efforts should have either been delegated to associates or

paralegals or conducted at a reduced rate.  Counsel for defendant did neither.[19]  This is

a major reason why the fee request in this case is so large.

Finally, a brief review of defendant's billing records shows that they include many

charges that should never have been included in any proper request for fees.  For

example, on June 8, 2010, defendant filed a motion for leave to file excess pages

[Docket No. 43], a motion to dismiss [Docket No. 44], and a motion to stay [Docket No.

45].  On June 9, 2010, the Court ordered that all three motions be stricken due to

failures to comply with the Local Rules and this Court's Practice Standards.  *See*

Docket Nos. 46, 47, 48.  Yet, defense counsel's billing records contain charges on June

9 and 10 arising out of their efforts to properly file these motions after their first attempts

---

[19]Defendant also notes that, as of the filing of the present motion, the Court had already awarded $3,546.00, and the magistrate judge awarded defendant an additional $4,060.00 in attorney's fees on May 3, 2011.  *See* Docket No. 259.  Defendant simply requests that these amounts be subtracted from the totals it requests in the present motion without articulating which aspects of its requested fees should be mooted by these awards.  The Court also notes that costs have been taxed against plaintiff in the amount of $9,060.77.  *See* Docket No. 297.

were stricken.[20]  Defendant does not explain why it should be permitted to recover fees incurred as a result of its own failure to comply with applicable rules.

Another example of an improper request is that for fees incurred in filing defendant's "Motion to Close Courtroom for December 21, 2010 Hearing" [Docket No. 174].  Defendant sought to close the courtroom, and seal of all the testimony during the December 21 hearing from the public, due to the disputes about certain SSNs.  During the December 21 hearing, defendant, in fact, agreed that simply using the first three digits of the disputed SSNs would suffice.  Defendant does not explain why plaintiff or Mr. Olsen should be required to pay the cost of filing that motion.

Furthermore, the Court held a hearing on December 27, 2011.  An attorney for defendant seeks to have Mr. Olsen pay for fours hours spent attending the hearing. The hearing, however, lasted two hours and eleven minutes.  Without some description of other included tasks, such as travel or preparation, defendant has not substantiated the reasonableness of that particular charge.

What defendant in effect asks the Court to do is wade through 200 pages of billing records and deduct from defendant's request any clearly inappropriate charges, amounts defendant would not have incurred had it mitigated its damages, and fees that defendant would have incurred in any event up to the point of the case's dismissal. This imposes an unreasonable burden on the Court, especially after the Court warned defendant in its February 8, 2011 Order that defendant needed to file a proper request in order to avoid "additional proceedings."  Docket No. 197.  In fact, it is ironic that

---

[20]In seeking to recover such fees, defense counsel described the court orders striking non-complying motions as the "court's concerns."  Docket No. 291-3 at 17.

defendant would expect the Court to perform that task in response to a sanctions motion predicated on the multiplication of proceedings.  The Court concludes that it has no reasoned basis to calculate the "reasonable number of hours spent" on account of the misconduct in this case.  *Cf. Kinnard v. Kelly*, 2010 WL 761230, at *6 n.12 (N.D. Ga. March 2, 2010) ("Plaintiff does not explain what factual basis exists for the request for $10,000 in costs. The $10,000 worth of costs requested by Plaintiff in its motion for default judgment is unreasonable on its face, and Plaintiff has not sustained its burden of showing that those fees are reasonable.").  That portion of defendant's motion requesting fees and costs will be denied.

Despite the Court's denial of defendant's request for fees and costs, defendant persuasively argues that plaintiff and her counsel should be punished for their conduct so as to deter future abuses of the litigation process.  The Court finds that plaintiff has been provided sufficient notice and opportunity to be heard regarding her conduct in this case.  *See Resolution Trust Corp. v. Dabney*, 73 F.3d 262, 268 (10th Cir. 1995) ("A party facing the possible assessment of costs, expenses or attorney fees has a due process right to notice that such sanctions are being considered by the court and a subsequent opportunity to respond.  An opportunity to be heard does not require an oral or evidentiary hearing on the issue; the opportunity to fully brief the issue is sufficient to satisfy due process requirements.").  As a sanction for plaintiff acting in bad faith and attempting to defraud the defendant and this Court, *see Braley*, 832 F.2d at 1510; *Alyeska Pipeline Service Co.*, 421 U.S. at 258-59 (1975),  the Court shall order plaintiff to pay $25,000.00 into the Registry of this Court.  *See Mark Industries, Ltd. v. Sea Captain's Choice, Inc.*, 50 F.3d 730, 733 (9th Cir. 1995) ("[T]he amount of an

41

inherent powers sanction is meant to do something very different than provide a substantive remedy to an aggrieved party . . . [but rather to] . . . 'vindicat[e] judicial authority'"); *see also Resolution Trust Co.*, 73 F.3d at 267 (sanctions may be payable to court account to compensate for court's time).

Mr. Olsen's conduct is also sanctionable.  For the reasons outlined above, Mr. Olsen had no reasonable basis to advance the many demonstrably false assertions of his client.  Mr. Olsen's defense for such conduct – a desire not to abandon his client – only highlights how far he strayed from his obligations.  The Court will order, as a sanction stemming from violations of Fed. R. Civ. P. 11, that Mr. Olsen also pay $25,000.00 into the Registry of the Court.  The law firm of Olsen & Brown, LLC is jointly responsible for payment of this amount pursuant to Fed. R. Civ. P. 11(c)(1).

### D.  Motion to Compel Disclosure of Attorney Client Communications

Defendant has requested that the Court order that communications between plaintiff and Mr. Olsen be disclosed pursuant to the crime-fraud exception to the attorney client privilege.  Defendant contends that such communications "are relevant to MSN's future motion for fees and costs."  Docket No. 140 at 1.  Defendant fails to articulate why unearthing more evidence of misconduct is consistent with avoiding further multiplication of the proceedings.  Because the Court concludes that the record contains more than sufficient evidence of misconduct, there is no need to delve any further into communications between plaintiff and Mr. Olsen.

### E.  Plaintiff's Motion for Sanctions

Plaintiff, through Mr. Olsen, filed a motion for sanctions against defendant [Docket No. 248].  Although framed as a motion, the filing is more akin to an additional

response to defendant's motion for fees and costs.  In any event, plaintiff has not provided any evidence for her claim that defendant "materially deceiv[ed]" the Court. *See* Docket No. 248 at 9.  For example, her claim that defendant "reneged on a settlement," Docket No. 248 at 5, ignores the basic principles of offer and acceptance. Furthermore, to the extent plaintiff is seeking sanctions in the form of attorney's fees, she failed to comply with the requirements of D.C.COLO.LCivR 54.3.  This motion will be denied.

## III.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendant's motion for attorney's fees and costs [Docket No. 160] is GRANTED in part and DENIED in part.  It is further

**ORDERED** that defendant's motion to compel disclosure of attorney client communications pursuant to the crime/fraud exception [Docket No. 140] is DENIED.  It is further

**ORDERED** that plaintiff's motion for sanctions against defendant [Docket No. 248] is DENIED.  It is further

**ORDERED** that, on or before December 31, 2011, plaintiff shall pay the sum of $25,000.00 into the Registry of the Court.  Upon receipt of the $25,000.00, the Clerk of the Court shall return to plaintiff her passport, which is presently being kept in the registry of the Court.  It is further

**ORDERED** that, on or before December 31, 2011, Mr. Olsen shall pay the sum of $25,000.00 into the Registry of the Court.

DATED September 30, 2011.

BY THE COURT:


 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge